

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-10-2005

# In Re Tower Air Inc

Precedential or Non-Precedential: Precedential

Docket No. 03-3101

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"In Re Tower Air Inc " (2005). *2005 Decisions.* Paper 1511.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1511

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————

No. 03-3101

————

IN RE: TOWER AIR, INC.,

*Debtor*

CHARLES A. STANZIALE, JR.,
Chapter 7 Trustee of Tower Air, Inc.,

*Appellant*

v.

FINOVA CAPITAL CORPORATION

————

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 01-cv-00792)
District Judge: The Honorable Gregory M. Sleet

————

Argued: October 26, 2004

Before: SCIRICA, *Chief Judge*, FISHER and
BECKER, *Circuit Judges*

(Filed: February 10, 2005)

DIANE E. VUOCOLO (ARGUED)
Duane Morris
1650 Market Street
One Liberty Place, 37th Floor
Philadelphia, PA 19103
*Attorney for Appellant*

JEFFREY M. SCHLERF
The Bayard Firm
222 Delaware Avenue
P.O. Box 25130, 9th Floor
Wilmington, DE 19899

JILL LEVI (ARGUED)
Todd & Levi
444 Madison Avenue
Suite 1202
New York, NY 10022
*Attorneys for Appellee*

————

OPINION OF THE COURT

————

BECKER, *Circuit Judge*.

This appeal by Charles Stanziale, the Chapter 7 trustee ("the Trustee") of debtor Tower Air, Inc., presents a question of first impression for us: whether a secured creditor in a Chapter 7 bankruptcy may recover the insurance proceeds intended to pay for damage to its collateral, while retaining the fully repaired collateral. We conclude that, under the circumstances of this case, it can. More specifically, we are satisfied that, under the language of section 9-306 of the Arizona Uniform Commercial Code (UCC) in effect at the relevant times, appellee FINOVA Capital Corporation, as an undersecured and cross-collateralized creditor, is entitled to recover both the collateral (an aircraft engine) and the proceeds. This conclusion is also supported: (1) by the language of the controlling agreements between Tower and FINOVA, which

2

grant FINOVA a right of approval over any use of insurance proceeds; and (2) by the fact that the insurance documents conferred upon FINOVA the status of a mortgagee payee, and not a mere loss payee. Finally, we reject the Trustee's contention that the equitable exception of § 552(b) of the Bankruptcy Code applies to prevent this result. We will therefore affirm the order of the District Court, which affirmed the order of the Bankruptcy Court awarding some $950,000 in insurance proceeds to FINOVA.

## I. Facts

On May 6, 1996, Tower, a then-solvent airline, borrowed $21 million from FINOVA to finance the purchase of a Boeing 747 and four aircraft engines. In connection with this transaction, Tower entered a series of agreements—including a security agreement, a promissory note, and a mortgage—giving FINOVA a security interest in the financed collateral, including the aircraft engine at issue in this case. The agreements specified that insurance proceeds of the engines were part of FINOVA's collateral.[1] Tower also covenanted to maintain insurance on the aircraft, and to submit any plans for use of insurance proceeds to FINOVA for approval.[2]

_____

[1]The mortgage agreement defined the term "Collateral" to include:

> the Aircraft [defined to include the airframe and engines, including the engine at issue] together with any and all attachments, accessories, improvements and betterments thereto and replacements thereof and all general intangibles and contract rights, including, but not limited to, all rents, issues, proceeds, insurance proceeds, properties, revenues and other income in respect of such aircraft and engines.

[2]Paragraph 5.4(a) of the security agreement provides:

> In the event of any payment made to the Borrower [Tower] by an insurer in connection with the Aircraft pursuant to a claim by the Borrower, the Borrower shall submit to the Lender [FINOVA] for approval a proposal

FINOVA also financed a number of Tower's other purchases, and had cross-collateralization agreements on all of those borrowings. Under these agreements, FINOVA's collateral for previous loans would become collateral for the May 6 loan, and the May 6 collateral (including the engine) would become collateral for the previous loans.[3]

FINOVA perfected its security interest by filing UCC financing statements with the State of New York and with Queens County, and by filing the mortgage with the FAA.[4] Both the financing statements and the mortgage explicitly provide for a security interest in any insurance proceeds arising from the aircraft and engines.

On August 23, 1997, the engine at issue in this appeal was severely damaged in an in-flight accident. Tower fully repaired the

---

for the use of such insurance proceeds. Notwithstanding the foregoing, subject to subparagraph 5.4(b) below [relating to total loss of the aircraft, and not relevant here], the Lender may in its sole discretion, apply such sum to the satisfaction of the Obligations and to the extent not so applied shall be paid over to the Borrower.

Paragraph 5.3 required Tower to maintain insurance on the aircraft and engines.

[3]The cross-collateralization was created in page 2 of the Aircraft Mortgage, in paragraph 7.1(b) of the Aircraft Loan and Security Agreement, and in Article 2 of the First Amendment to Consolidated, Amended and Restated Aircraft and Engine Loan and Security Agreement.

[4]To perfect a security interest in aircraft or aircraft engines, a secured party must file its mortgage with the Federal Aviation Administration (FAA). See 49 U.S.C. § 44107. Under the Arizona UCC, which governed the parties' obligations under ¶ 9.4 of the security agreement, if a federal statute provides for national registration of security interests in a given type of property, a secured party need not file a UCC financing statement to perfect an interest in such property. Ariz. Rev. Stat. § 47-9302(C) (1999). As 49 U.S.C. § 44107 is such a statute, FINOVA perfected by filing with the FAA, and its UCC filings in New York were unnecessary. The Trustee does not dispute that FINOVA properly perfected its security interest in the engine.

engine at a total cost of $2,251,747.51, of which $1,951,503.26 was directly attributable to the accident.

On February 29, 2000, Tower filed a voluntary Chapter 11 petition in the Bankruptcy Court for the District of Delaware. Tower operated as a debtor-in-possession until December 2000, when it converted to Chapter 7. Charles A. Stanziale, Jr., who had been the Chapter 11 trustee, was appointed Chapter 7 trustee. FINOVA claims that, at the time of the bankruptcy, Tower owed FINOVA some $56 million under various loan agreements collateralized by, among other assets, the engine at issue here. During the bankruptcy proceedings in 2004, the engine was returned to FINOVA, in partial satisfaction of FINOVA's secured claim. Some of FINOVA's other collateral was apparently destroyed or impaired by Tower, but there is no dispute that the engine was returned in fully repaired condition. FINOVA contends that the total value of all returned collateral was some $36 million, leaving it undersecured by some $20 million.

In performing his due diligence, the Trustee discovered that Tower maintained an accident insurance policy on the engine. He therefore submitted a claim for $1,951,503.26 to the insurers. The insurers agreed to settle the claim for $951,503.26—the claim amount minus the policy's $1 million deductible—in May 2001. The Trustee then filed a motion in the Bankruptcy Court seeking approval to enter the settlement. FINOVA timely objected, claiming that it, not the estate, was entitled to the insurance proceeds. The Bankruptcy Court approved the settlement, but directed the Trustee to hold the funds in escrow pending a decision on this issue.

On August 27, 2001, the Bankruptcy Court awarded the proceeds to FINOVA. *In re Tower Air, Inc.*, 268 B.R. 404 (Bankr. D. Del. 2001). The Trustee appealed to the District Court, which entered an order affirming the Bankruptcy Court's opinion. *Stanziale v. FINOVA Capital Corp. (In re Tower Air, Inc.)*, No. 01-CV-792, 2003 U.S. Dist. LEXIS 10108, 2003 WL 21398007 (D. Del. June 16, 2003). This appeal followed.

## II. Jurisdiction and Standard of Review

The Bankruptcy Court had subject matter jurisdiction pursuant to 28 U.S.C. § 157. The District Court had jurisdiction

5

under §§ 158(a) and 1334, and this Court has appellate jurisdiction under § 158(d). We exercise plenary review of the District Court's conclusions of law. *Prof'l Ins. Mgmt. v. The Ohio Group of Ins. Cos. (In re Prof'l Ins. Mgmt.)*, 285 F.3d 268, 282-83 (3d Cir. 2002). Since the District Court sat as an appellate court to review the Bankruptcy Court, "we review the Bankruptcy Court's legal determinations de novo, its factual findings for clear error, and its exercises of discretion for abuse thereof." *Id*. (citing *In re Engel*, 124 F.3d 567, 571 (3d Cir.1997)).

The Trustee appeals the Bankruptcy Court's decision that the insurance proceeds were part of FINOVA's collateral under the Arizona UCC. This is a legal determination that we review de novo. The Trustee also appeals the Bankruptcy Court's refusal to grant him equitable relief under 11 U.S.C. § 552(b). The decision whether to apply the equitable exception under § 552(b) is reviewed for abuse of discretion. *See Halvajian v. Bank of N.Y. (In re Halvajian)*, 216 B.R. 502, 508 (D.N.J. 1998), *aff'd* 168 F.3d 478 (3d Cir. 1998); Am. Jur. Bankruptcy § 3512.

The parties agree that this dispute is governed by Arizona law, as provided by paragraph 9.4 of the security agreement.

## III. The UCC Provisions

This case turns primarily on the provisions of the Arizona UCC that govern a creditor's rights to the proceeds of his collateral.[5] The default rule is that a security interest in property includes an interest in the proceeds of that property. Ariz. Rev. Stat. § 47-9203(C) (1999) ("Unless otherwise agreed a security agreement gives the secured party the rights to proceeds provided by § 47-9306."). The parties here did not opt out of this default; rather, they explicitly granted FINOVA a security interest in proceeds in the mortgage. The Trustee argues, however, that this security interest does not give FINOVA a right to the disputed insurance money, because that money is not "proceeds" properly understood, and because awarding it to FINOVA would constitute

---

[5]In July 2001, Arizona adopted a revised UCC Article 9. *See* 1999 Ariz. Sess. Laws ch. 203. The pre-revision Arizona UCC was in place at all relevant times during this controversy; we will refer mainly to that Code, and will do so in the present tense.

a double recovery forbidden by the UCC. We consider each of these contentions in turn.

A. The Meaning of Proceeds

Our starting point is perforce UCC § 9-306, which defines the term "proceeds" and governs a secured creditor's rights to the proceeds of his collateral. The relevant parts of this section are set forth in the margin.[6] The definition of "proceeds" is found in

---

[6] Section 9-306, as numbered in the Arizona statute, reads:

**§ 47-9306. "Proceeds"; secured party's rights on disposition of collateral**
A. "Proceeds" includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement. Any payments or distributions made with respect to investment property collateral are proceeds. Money, checks, deposit accounts and the like are "cash proceeds". All other proceeds are "non-cash proceeds".
B. Except where this chapter otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.
C. The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected ten days after receipt of the proceeds by the debtor unless:
. . .
2. A filed financing statement covers the original collateral and the proceeds are identifiable cash proceeds;
. . .

subsection (a), the first sentence of which defines the term to include "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." Ariz. Rev. Stat. § 47-9306(A). The following sentence reads: "Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement." *Id*.

The plain language of § 9-306(a) leaves no doubt that the insurance money at issue here constitutes proceeds of the engine, because it was "[i]nsurance payable by reason of loss or damage to the collateral." FINOVA, by perfecting its security interest in the engine, was entitled to look to those proceeds as collateral under § 9-306(b). Under 11 U.S.C. § 552(b), prepetition security interests that apply to proceeds of collateral also apply to proceeds of such collateral acquired after the bankruptcy petition. It is undisputed that FINOVA had perfected its security interest in the engine prior to Tower's bankruptcy. FINOVA's interest in those proceeds was therefore also perfected, because Tower had not received them prior to entering bankruptcy. *See* Ariz. Rev. Stat. § 47-9306(D)(2) & (3).

The Trustee argues that the first sentence of § 9-306(a), which requires a "sale, exchange, collection or other disposition" of property, limits the definition of "proceeds" to encompass only the results of a "transforming event." Under this view, a creditor

---

D. In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:

. . .
2. In identifiable cash proceeds in the form of money which is neither commingled with other money nor deposited in a deposit account prior to the insolvency proceedings;
3. In identifiable cash proceeds in the form of checks and the like which are not deposited in a deposit account prior to the insolvency proceedings; . . . .

Ariz. Rev. Stat. § 47-9306 (1999).

8

can obtain the proceeds only as a substitute for the original collateral, not as an addition to it. But this interpretation is contradicted by the clear language of the second sentence ("Insurance payable by reason of loss or damage to the collateral is proceeds . . ."), and we have found no case that supports it.[7]

---

[7]The Trustee cites a number of cases that contain general statements that insurance is proceeds where the collateral is completely lost. But these cases do not support the inverse proposition that insurance is *not* proceeds where the collateral survives in some form. *See Miller v. Norwest Bank Minn., N.A. (In re Inv. & Tax Servs., Inc.)*, 148 B.R. 571, 573 (Bankr. D. Minn. 1992) ("Where the creditor requires the debtor to insure the collateral and the collateral is subsequently destroyed, the insurance proceeds are in essence proceeds from the disposition of the collateral."); *Stodd v. Reynard (In re Shooting Star Enters., Inc.)*, 76 B.R. 154, 156 (B.A.P. 9th Cir. 1987) ("Although it is well recognized that the term 'proceeds' is to be given a broad and flexible interpretation, it is also recognized that '[p]roceeds constitute whatever is substituted for the original collateral.'") (quoting *In re Judkins*, 41 B.R. 369, 372 (Bankr. M.D. Tenn. 1984)); *Ford Motor Credit Co. v. Stevens (In re Stevens)*, 130 F.3d 1027, 1030 (11th Cir. 1997) ("In the context of the insurance policy on the truck, therefore, the proceeds act as a substitute for the insured collateral.").

Similarly, the Trustee cites an academic article for the proposition that "[i]f one attempted to hypothesize the ex ante bargain of the reasonable debtor and secured party, one would expect them to understand that insurance monies would stand in the stead of damaged collateral." R. Wilson Freyermuth, *Rethinking Proceeds: The History, Misinterpretation and Revision of U.C.C. Section 9-306*, 69 Tul. L. Rev. 645, 658 (1995). This article does not support the Trustee's position. First of all, Professor Freyermuth, like the cases discussed in the previous paragraph, merely argues that proceeds should include (at a minimum) "substitutes" for damaged collateral, *not* that they should include *only* such substitutes. In fact, he argues for a liberalized definition of proceeds, one that would include lease payments, *id.* at 659-67, and cash dividends on stock, *id.* at 668-72, neither of which are substitutes for the underlying collateral. Furthermore, Freyermuth relies on the hypothetical *ex ante* bargain between debor and creditor, while in this case we can examine the *actual ex ante* bargain, which granted FINOVA an absolute right of approval over the insurance proceeds, *see infra* Part IV.A, and a mortgagee payee interest in those proceeds, *see infra* Part IV.B. Together, these agreements constitute strong evidence

We are also confident that the Arizona courts would reject the Trustee's view. The Arizona Court of Appeals has read the second sentence of § 9-306(a) independently of the first and held that "the meaning of [the second sentence of § 47-9306(A)] is clear on its face," and that "the 'right to payment' under an insurance policy constitutes 'proceeds' subject to Article 9 of the UCC." *Valley Nat'l Bank of Ariz. v. Cotton Growers Hail Ins., Inc.*, 747 P.2d 1225, 1231 (Ariz. Ct. App. 1987). We note too that *Airwork Corp. v. Markair Express, Inc. (In re Markair, Inc.)*, 172 B.R. 638 (B.A.P. 9th Cir. 1994), a (non-Arizona) Ninth Circuit Bankruptcy Appellate Panel case, assumed, though it did not directly hold, that a secured creditor could be entitled to keep both a repaired aircraft engine and the insurance proceeds thereof.

We therefore are not convinced that § 9-306(a) limits the *definition* of "proceeds" to encompass only those proceeds that entirely *replace* collateral. Instead, it is quite clear that the insurance money at issue here constitutes "proceeds" under the UCC's definition.

## B. The Limitation to One Recovery

We acknowledge that there is significant intuitive appeal to the notion that a creditor should not be able to recover both his collateral and the proceeds thereof. Such a situation bears a resemblance to a double recovery. The UCC provides that "The secured party may claim both proceeds and collateral, but may of course have only one satisfaction." Ariz. Rev. Stat. § 47-9306 cmt. 3 (1999).[8] Thus, while we have decided that the insurance money

---

that the expectations of the parties favor allowing FINOVA to recover.

[8]The revised UCC moves this limitation to one recovery from the official comments to the statutory text, and changes its wording significantly. *See* Ariz. Rev. Stat. § 47-9102(64) (2004) ("Proceeds . . . means . . . (e) *to the extent of the value of collateral* and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or noncomformity of, defects or infringement of rights in, or damage to the collateral." (emphasis added)). This provision was not, of course, in effect at the times relevant to the current dispute; hence we need not explore its meaning.

constitutes "proceeds," we must conduct a further inquiry before deciding conclusively that FINOVA is entitled to recover it. FINOVA has a claim to any proceeds of its collateral under UCC § 9-306 and 11 U.S.C. § 552(b), but that claim may be superseded by the UCC's limitation to "one satisfaction." We examine that limitation below, both in the general case and as applied to cross-collateralized creditors. We also draw an analogy to the case in which the collateral is sold, rather than damaged, and use the courts' treatment of sale proceeds to inform our treatment of insurance proceeds.

### 1. The Meaning of "One Satisfaction"

It is perfectly evident that the creditor's recovery is limited by the amount of its debt: a creditor who lends $100 secured by an engine with a fair market value of $100 cannot recover both the engine (at its full value) and any insurance proceeds on it. This is the minimum meaning of Comment 3. It is equally clear that the creditor's security interest is limited by the amount of its collateral: a creditor who lends $200 secured only by an engine with a value of $100 is secured only for $100; the remaining $100 of its debt will be only an unsecured claim in bankruptcy. *See* 11 U.S.C. § 506(a).

The difficult case is where the value of the original collateral *plus* proceeds exceeds the value of the original collateral, but is less than the amount of the debt. In that case, may the creditor recover the collateral and proceeds (limited only by the amount of its debt), or is it limited to the value of its original collateral? This is a vexing question, and one that does not seem to have been directly decided.[9] On the one hand, the debtor might

---

[9]Several courts have decided a related but not identical issue. This line of cases involves a confirmed Chapter 11 or 13 plan which includes a cram-down of a secured creditor's claim on an asset of the estate (often a motor vehicle); after the asset is destroyed, the creditor demands the insurance proceeds to the extent of its original claim rather than its claim as modified by the plan. In these cases, the courts reject the creditor's attempt to get an additional satisfaction of its debt, stating that the creditor's "interest in the insurance proceeds flowing from the destruction of the secured collateral is only as great as its interest in the

argue that the creditor's security interest is limited to the value of the collateral, not of the claim. Giving the insurance payment to the creditor would arguably create a larger security interest than the creditor bargained for, and thus lead to a windfall. On the other hand, the plain language of the UCC gives the creditor a security interest in proceeds of the collateral. The creditor's "windfall" is no different from a situation in which the collateral's market value increases: the creditor simply gets the benefit of all increases in value of the collateral—whether those increases come by appreciation or by insurance payments—up to the total value of the claim.

Because FINOVA's cross-collateralization, and other facts specific to the case at bar, are enough for FINOVA to recover, we need not decide this question in the general case.[10]

## 2. The Cross-Collateralization

collateral itself." *Ford Motor Corp. v. Stevens (In re Stevens)*, 130 F.3d 1027, 1030 (11th Cir. 1997); *accord Ford Motor Corp. v. Feher*, 202 B.R. 966 (Bankr. S.D. Ill. 1996); *In re Arkell*, 165 B.R. 432 (Bankr. M.D. Tenn.); *see also In re Jones*, No. 99-43196, 2004 WL 2191692 (Bankr. S.D. Ga. June 4, 2004). These cases are easily distinguishable: in the *Stevens* line, the creditor's secured claim had already been modified, and it was asking for insurance proceeds that exceeded the value of its allowed claim under the plan. The *Stevens* creditor was asking for more than "one satisfaction" of its *secured debt*, as modified by the debtor's court-approved plan. Tower, on the other hand, is in Chapter 7, and no plan has been approved that could modify FINOVA's secured claim. Moreover, unlike in *Stevens*, the engine at issue here was not being used by the estate under a cram-down; rather, it had already been returned to FINOVA as part of Tower's liquidation.

[10]We note that the revised UCC might allow the creditor to recover only the original value of his collateral; the revised Code now defines "proceeds" to include insurance only "to the extent of the value of collateral." Ariz. Rev. Stat. § 47-9102(64) (2004). While this language is not perfectly clear, it would seem to limit recovery to the value of the original collateral; insurance payments beyond that value would, it seems, not constitute "proceeds." But, of course, the revised UCC was not in effect at any time relevant to this case, and we have already concluded that the insurance money did constitute "proceeds" under the old UCC, *see supra* Part III.A.

FINOVA's loans to Tower were cross-collateralized; that is, under the May 6, 1996, agreements between Tower and FINOVA, numerous Tower assets became collateral for numerous loans by FINOVA. In FINOVA's submission, Tower owed FINOVA some $56 million when it filed for bankruptcy, and returned collateral worth $36 million, leaving some $20 million still due. Much of FINOVA's collateral was apparently damaged or impaired due to Tower's negligence.

The result of this cross-collateralization is that the original value of FINOVA's collateral was not merely the original value of the aircraft engine at issue in this case. Instead, FINOVA had numerous pieces of collateral collectively worth millions of dollars. Much of this collateral was impaired or damaged at some point between the time Tower entered the financing agreements and the time the disputed insurance proceeds were paid. This fact is important because it eliminates any concern we might have about giving FINOVA a windfall by allowing it to recover those proceeds. As we note above, there may be some reason to think that the UCC's limitation to "one satisfaction" limits secured creditors to the original value of their *collateral*, although we will ultimately conclude, based on an analogy to sale proceeds, that the better view is to allow creditors to recover up to the value of their *debt*, *see infra* Part III.B.3. But even if we were to limit FINOVA to the original value of its collateral, the fact of cross-collateralization means that it will certainly recover less than the original value of *all* of its collateral.

The effect of the cross-collateralization clauses was to make some large quantity of Tower's assets collateral for all $56 million of its debt to FINOVA.[11] If the only impairment to FINOVA's collateral were the damage to the engine, and if that damage were fully repaired, then the insurance proceeds would increase the value of the collateral, and create a difficult case, *see supra* Part III.B.2. But in fact collateral worth millions of dollars was destroyed. Thus it is misleading to state that Tower returned the

_____

[11]The record does not reflect the exact value of the assets involved in the cross-collateralization agreements. In any case, it would seem to be significantly greater than the $36 million worth of collateral that was ultimately returned to FINOVA. At all events, our analysis does not depend on the exact figure.

collateral at issue here in fully repaired condition. The specific aircraft engine was returned fully repaired, but much other collateral was destroyed, damaged, or subject to liens, and all of this collateral secured the same loans. We therefore should not view the insurance proceeds on one particular engine as increasing the value of that specific piece of collateral, and thus creating a windfall; rather, we should view it as only partially compensating for the destruction of several other pieces of collateral. On that view, awarding those proceeds to FINOVA does not create more than one satisfaction, as the overall value of the collateral is still significantly impaired.

The cross-collateralization clauses, and the fact that FINOVA's other collateral was impaired, leave us satisfied that awarding the insurance proceeds to FINOVA would not create a windfall or a double satisfaction. Even if it recovers both the engine and the insurance proceeds, FINOVA will still recover less than its entire debt, and also less than the original value of its collateral. In such circumstances, a double recovery is impossible.

### 3. The Analogy to Sale of Collateral

While few cases directly address the issue of whether a creditor can recover both repaired collateral and the insurance proceeds for damage to that collateral, several courts have examined the situation in which creditors claim both collateral and the *sale* proceeds of that collateral. Because sale and insurance proceeds are governed by the same UCC provisions, *see* Ariz. Rev. Stat. § 47-9306(A), these cases provide a helpful analogy to the present case, and inform our understanding of the meaning of "one satisfaction" under § 9-306.

To clarify our discussion, we use a hypothetical case. A creditor lends a debtor $100, secured by an engine initially worth $100. The engine's value then depreciates to $50, and the debtor secretly sells it to a third party for $50. The hypothetical relies on the assumption that the third-party buyer is not a bona fide purchaser or buyer in ordinary course, and has no right to retain the engine. We also assume that the sale price is § 9-306 "proceeds," and that the creditor's security interest in it is perfected under § 9-306(c) & (d). If the debtor then enters Chapter 7 bankruptcy and cannot pay its unsecured debts, may the creditor then claim the $50

14

proceeds from the debtor *and* proceed against the third party on its perfected security interest in the engine?

The language of § 9-306(b) seems clear enough: the creditor's security interest "continues in collateral notwithstanding sale . . . unless the disposition was authorized by the secured party . . . and also continues in any identifiable proceeds including collections received by the debtor." Ariz. Rev. Stat. § 47-9306(B). The creditor can thus look to both the sale proceeds and the engine itself (in the third party's hands).

Here again, the creditor "may claim both proceeds and collateral, but may of course have only one satisfaction." Ariz. Rev. Stat. § 47-9306 cmt 3. The crucial question, in this hypothetical as in the case at bar, is what constitutes a "satisfaction." Does this comment mean that the creditor may *claim* both proceeds and collateral, but only *receive* one of them? Or does it mean that the creditor may *receive* both proceeds and collateral, so long as its total recovery is less than the value of its debt?

In our view, it is clear that the creditor may receive both proceeds and collateral, and is limited only to the amount of its *debt*, not the value of the underlying *property*. *See, e.g.*, *Taylor Rental Corp. v. J.I. Case Co.*, 749 F.2d 1526, 1529 (5th Cir. 1985) (interpreting identical Florida UCC provision and stating that "[a] creditor may pursue several remedies until the debt is satisfied"); *Standard Dyeing & Finishing Co. v. Arma Textile Printers Corp.*, 85 Civ. 5399, 1991 WL 49782, *7 (S.D.N.Y. Mar.25, 1991) ("'When an unauthorized disposition of collateral has occurred, a secured party has numerous cumulative remedies at its disposal; it is not forced to elect a single remedy. . . . [A] creditor may pursue several remedies until the debt is satisfied.'") (citation and emphasis omitted); *Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*, 2002 WL 31174470, *12 (S.D.N.Y. 2002); *cf. Frantz v. First Nat. Bank & Trust Co. of Wyoming*, 687 P.2d 1159, 1162 (Wyo. 1984) ("Although [a creditor] is entitled to only one satisfaction *for the underlying debt*, he may seek it in different ways." (emphasis added)).

These cases demonstrate that our hypothetical creditor could recover both collateral and proceeds up to the amount of his debt, and present a clear analogy to the case at bar. In our hypothetical case, the creditor is undersecured because of depreciation in the value of the engine; here, the creditor is undersecured because of

loss of other collateral specifically covered by cross-collateralization clauses. As discussed above, *see supra* Part III.A.2, the cross-collateralization clauses allow FINOVA to treat all of its collateral, and the proceeds thereof, as collateral for all of its debts. Thus, by virtue of the loss of its other collateral, FINOVA is in essentially the same situation as our hypothetical creditor whose single piece of collateral has depreciated, and can recover from both the collateral and the proceeds.[12]

The Trustee disagrees with this result, citing a Bankruptcy Court case that holds that a secured claim is limited to the sale price of the collateral where it was sold pursuant to a Chapter 11 plan. *See In re Broomall Printing Corp.*, 131 B.R. 32, 36 (Bankr. D. Md. 1991); *cf. United Fruit & Produce Co. v. Absolute Exterminating (In re United Fruit & Produce)*, 242 B.R. 295, 306 (Bankr. W.D. Pa. 1999). We do not think that *Broomall* is applicable here. Tower is not in Chapter 11, and far from getting court or creditor approval for the "disposition" of the collateral, Tower repaired it without getting FINOVA's contractually required permission. We note that § 9-306(b) grants a creditor a continuing interest in both collateral and proceeds *unless* the creditor authorized the transfer, Ariz. Rev. Stat. § 47-9306(B); the fact of authorization in *Broomall* distinguishes it from the present case.

We thus conclude that, under the Arizona UCC as it was in effect at the time relevant to this case, FINOVA was entitled to recover both its collateral and the insurance proceeds from that collateral.

## IV. The Contractual Provisions

Our UCC holding is also supported by several provisions in the agreements between Tower and FINOVA, which strengthen FINOVA's claim to the insurance proceeds. The first of these is a contract clause that granted FINOVA a right of approval over any use of insurance proceeds; the second is the insurance agreement, which gave FINOVA the (extensive) rights of a "mortgagee payee."

---

[12]We take no position on what the result might be under the revised UCC, *see supra* note 10, either in our hypothetical or in the case at bar.

## A. FINOVA's Right of Approval

Paragraph 5.4(a) of the security agreement gives FINOVA the right to approve any use of any insurance proceeds by Tower, and allows FINOVA the right to, "in its sole discretion, apply such [proceeds] to the satisfaction of the Obligations."

It is undisputed that Tower repaired the engine without either filing an insurance claim or asking for FINOVA's approval. But the contract unequivocally grants FINOVA, not Tower, the right to decide how to use any insurance proceeds. FINOVA had the "sole discretion" to decide to apply the insurance proceeds to the satisfaction of Tower's debt, rather than to repairing the engine. Tower's decision to repair the engine, rather than file an insurance claim and get FINOVA's approval on the use of the proceeds, deprived FINOVA of the benefit of ¶ 5.4(a).

The Bankruptcy Court cited *Pima County v. Ina/Oldfather 4.7 Acres Trust #2292*, 145 Ariz. 179, 700 P.2d 877 (Ariz. Ct. App. 1984), for the proposition that Arizona courts would enforce contract clauses similar to ¶ 5.4(a). The *Pima County* court upheld clauses in a mortgage agreement that allowed the mortgagee to apply any fire insurance proceeds or condemnation awards to the amount of the debt, hold the proceeds as additional security, or release them to the mortgagors, at the mortgagee's discretion. 700 P.2d at 879. The mortgagors in that case argued that an award for partial condemnation of the property should have been split between themselves and the mortgagee, because giving the full award to the mortgagee left it oversecured. *Id.* The Arizona court rejected this argument and gave the entire award to the mortgagee, requiring it to use the award either as additional security or to reduce the amount of the mortgagors' indebtedness. *Pima County* strongly suggests that Arizona courts will give secured parties the benefit of their bargain with regard to use-of-proceeds clauses, even if it leaves them with what might appear to be a recovery greater than their security interest (but less than or equal to the amount of the underlying debt). The Bankruptcy Court correctly took this as an indication that Arizona courts would uphold ¶ 5.4(a) and let FINOVA decide how to use the insurance proceeds.

FINOVA thus had an interest in the insurance proceeds, payable to it independent of any action (including repairs) taken by Tower. It had the right to approve Tower's use of the proceeds, and

to apply them to its own debt rather than to repairing the engine. The Trustee states in his brief that FINOVA "made a bad deal with the Debtor resulting in FINOVA holding a secured and unsecured claims against the Debtor." But in fact it is difficult to see how FINOVA could have made its deal any more bulletproof than this. It bargained for, and received, an absolute right to the insurance proceeds, and the Trustee's attempts to restrict that right are unavailing.[13]

## B. The Standard Mortgage Policy Language

It is well settled, in non-UCC (mainly real property) contexts, that certain mortgagees can claim insurance proceeds on their collateral, even when they suffer no loss. *See, e.g.*, *Savarese v. Ohio Farmers Ins. Co.*, 260 N.Y. 45, 57, 182 N.E. 665, 668 (N.Y. 1932). The cases that so hold depend on the nature of the insurance clause involved.

The Bankruptcy Court cited one representative example, *Grange Mut. Cas. Co. v. Central Trust Co., N.A.*, 774 S.W.2d 838, 840 (Ky. Ct. App. 1989), in which a mortgagee bank sued an insurer who refused to pay out on a fire insurance policy because the mortgagor had, at his own expense, repaired the mortgaged property. The Kentucky court stated:

> The right of the mortgagee under a standard mortgage [insurance] clause is not dependent upon his sustaining loss. That is, the mortgagee under such a clause acquires a right to the insurance proceeds even though he suffers no actual loss, as when the building was restored to its former condition by the mortgagor.

---

[13]At oral argument, counsel for the Trustee sought to minimize the effect of this contractual provision, noting that many contracts are invalidated or modified in bankruptcy. We think, however, that *Pima County* indicates that the Arizona courts would look to contractual provisions like ¶ 5.4(a) to help define a creditor's *security interest*. If ¶ 5.4(a) gave FINOVA the right to apply insurance proceeds to increase its security interest, then those proceeds are part of its secured claim and so belong to FINOVA, not the bankruptcy estate.

*Id*. This language applies to mortgagee payees, but not to loss payees.

The difference between mortgagee and loss payees has been spelled out by an Arizona court. A loss payee is "a mere appointee to receive the proceeds to the extent of his interest." *Granite State Ins. Co. v. Employers Mut. Ins. Co.*, 609 P.2d 90, 92 (Ariz. Ct. App. 1980) (quoting 5A J. Appleman, Insurance Law and Practice § 3335). In loss-payee cases "the policy [is] subject to any act or omission of the insured which might void, terminate, or adversely affect the coverage; and if the policy is not collectible by the insured, the appointee, likewise, cannot recover thereunder." *Id.* (quoting Appleman, *supra*, § 3335). On the other hand, "[i]n contradistinction with a basic loss payee whose rights are totally derivative, a mortgagee payee has an independent agreement with the insurer." *Id*. The mortgagee payee is treated "just as if [he or she] had applied for the insurance entirely independently of the mortgagor." *Id*. at 93 (quoting Appleman, *supra*, § 3401).

The choice of which category the payee falls under depends on the language of the insurance clause: a "standard" or "union" clause creates a mortgagee payee, while a "simple" clause creates a loss payee. *See* 4 Lee R. Russ et al., Couch on Insurance §§ 65:8, 9, 32 (3d ed. 1984) (hereinafter Couch). The main difference is that the loss payee "is subject to such defenses as the insurer may have against the mortgagor, while the [mortgagee payee] is not." *Id.* § 65:9.

It seems clear that FINOVA is a mortgagee payee. The insurance certificate issued to FINOVA provides that "[w]ith respect to the interest of the Certificate Holder, the insurance afforded shall not be invalidated by any act or neglect of the Named Insured," which creates a mortgagee-payee interest. The certificate also does not specifically state that FINOVA may receive proceeds only to the extent of its interest, which is a normal element of the "simple" (loss payee) clause, *see* 4 Couch § 65:9.

Because FINOVA is a mortgagee payee, it can, by analogy to non-UCC insurance law, recover the proceeds to the extent of its debt, even though Tower repaired the damage to its collateral:

> A mortgagee may recover policy proceeds under a standard mortgage clause, even though, because of a

restoration of the property by the mortgagor, the mortgagee has suffered no actual loss. . . . As a corollary of the view that restoration does not defeat the right of the mortgagee to recover, it is held that *the fact that the mortgagor has repaired the damage does not entitle him or her to recover the proceeds of the insurance*.

4 Couch § 65:62 (emphasis added). The mortgagee's "loss is measured in terms of the value of the debt, not the actual economic loss to the mortgagee." *Id.* § 65:36.[14]

The Trustee argues that that it was "erroneous and improper" for the Bankruptcy Court to rely on non-UCC, non-bankruptcy mortgage cases. We are not persuaded. We agree that, if relevant UCC precedents clearly established that Tower has a right to the proceeds, reliance on contrary non-UCC law would be misplaced. Where, however, there are no UCC cases directly on point, *see supra* Part III.B.1, and what cases there are suggest that FINOVA can recover the proceeds, *see supra* Part III.B.3, we think it is reasonable to look to analogous non-UCC law to strengthen our conclusion that this recovery accords with basic fairness and the common law.[15]

---

[14]On the other hand, the mortgagee's right to retain insurance proceeds "is limited by the mortgagee's duty, under § 4.7(b), to permit use of the funds for restoration of the loss or damage to the real estate." Restatement (Third) of Property: Mortgages § 4.7, cmt. d (2004); *see also id.* § 4.7(b); 12 Couch § 178:58. This provides little guidance in cases where the mortgagor has *already* restored (and then liquidated) the property—or in cases, such as this one, where a contractual clause specifically gives the mortgagee the discretion of how to apply proceeds. Had Tower followed the requirements of ¶ 5.4(a) of the security agreement, and demanded that FINOVA allow it to use the insurance funds to repair the engine, the Restatement's approach might apply. In the case at bar, it does not.

[15]Similarly, we see no reason to ignore the line of cases exemplified by *Savarese*, *supra*, merely because they occurred outside of bankruptcy. As we have already determined that the insurance payments are proceeds of collateral for UCC purposes, *see supra* Part III.A, FINOVA can recover them under § 552 of the Bankruptcy Code

In sum, FINOVA's contractual right of approval over Tower's use of the insurance proceeds, and its mortgagee payee rights in the insurance contracts, further support its claim to treat the insurance proceeds as part of its security. Because this accords with our UCC conclusion in Part III, we conclude that FINOVA is entitled to recover the insurance proceeds under the UCC and the Bankruptcy Code.

## V. The Equity Exception

The Trustee also argues that, even if his claim fails as a legal matter, the Bankruptcy Court abused its discretion in refusing to grant him equitable relief under 11 U.S.C. § 552(b), which allows a court to modify security interests as a matter of equity.[16]

The Bankruptcy Court reasoned that the equity exception was intended to strike "an appropriate balance between the rights of secured creditors and the rehabilitative purposes of the Bankruptcy Code." *United Va. Bank v. Slab Fork Coal Co.*, 784 F.2d 1188 (4th Cir. 1986). It noted that the normal application of the equity exception is in Chapter 11 cases, to prevent an oversecured lender from receiving a windfall by taking assets that would otherwise go to rehabilitating the debtor. Section 552(b) is normally relevant in Chapter 11, "to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of

---

unless such recovery would constitute a double satisfaction. We look to insurance law, and the *Savarese* cases, to determine whether FINOVA has a non-bankruptcy right to receive the proceeds without regard to Tower's repairs. Because FINOVA does have such a right to those proceeds, despite Tower's repairs, there is less reason to think that the proceeds constitute an unfair double satisfaction.

[16]The Bankruptcy Code provides that prepetition security interests extend to postpetition "proceeds, product, offspring, or profits" of prepetition collateral, "to the extent provided by such security agreement and by applicable nonbankruptcy law, *except to the extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.*" 11 U.S.C. § 552(b)(1) (emphasis added); *see also* § 552(b)(2) (similar exception for postpetition "fees, charges, accounts, or other payments" paid for use of prepetition collateral).

the estate." *In re Bennett Funding Group, Inc.*, 255 B.R. 616, 634 (N.D.N.Y. 2000) (quoting *Great-West Life & Annuity Assurance Co. v. Parke Imperial Canton, Ltd.*, 177 B.R. 843, 855 (N.D. Ohio 1994)).

This case, however, was a Chapter 7 liquidation, Tower was beyond any hope of rehabilitation, and assets of the estate were not used to increase the value of FINOVA's collateral during bankruptcy proceedings. Indeed, all of the repairs were made long before the bankruptcy petition was filed.[17] While the pre-petition repairs to the engine did increase the value of FINOVA's collateral, Tower's apparent negligence seems to have caused the destruction of other FINOVA collateral, and left FINOVA greatly undersecured. Thus, FINOVA's recovery here hardly constitutes a windfall. Instead, FINOVA will simply recover what it is due as a secured creditor with a valid security interest in the insurance proceeds. The Trustee has advanced no reason for us to conclude that this result is inequitable.

## VI. Conclusion

We hold that the Bankruptcy Court was correct in awarding the insurance proceeds to FINOVA, and did not abuse its discretion in refusing to invoke the equitable exception. We will therefore affirm the order of the District Court.

---

[17]From this fact, the Bankruptcy Court drew the conclusion that the insurance proceeds would not otherwise have been part of Tower's estate, and thus available to pay its general unsecured creditors. We find this conclusion inexplicable; the insurance proceeds are simply a pool of money, and if they were not reserved to FINOVA, then they would seem to be assets of the estate and available to pay general creditors.