OPINION
FISHER, Circuit Judge.
We are asked in this appeal to decide whether Section 1129(b)(2)(A) of the Bankruptcy Code requires that any debtor who proposes, as part of its plan of reorganization, a sale of assets free of liens must allow creditors whose loans are secured by those assets to bid their credit at the auction. Because subsection (iii) of Section 1129(b)(2)(A) unambiguously permits a debtor to proceed with any plan that provides secured lenders with the “indubitable equivalent” of their secured interest in the assets and contains no statutory right to credit bidding, we will affirm the District Court’s approval of the proposed bid procedures.
I.
Philadelphia Newspapers, LLC (the “Debtors[1]'') own and operate the print newspapers the Philadelphia, Inquirer and Philadelphia Daily News and the online publication philly.com. The Debtors acquired these assets in July 2006 for $515 million as part of an acquisition of the businesses by an investor group led by Philadelphia PR executive, Brian Tierney. $295 million of this purchase price came from a consortium of lenders who are collectively the appellants in this action (the “Lenders”).[2] This loan was made pursuant to a Credit and Guaranty Agreement dated June 29, 2006, between the Lenders and the Debtors (the “Loan Agreement”). The Loan Agreement and other loan documents provide that the Lenders hold first priority liens in substantially all of the Debtors’ real and personal property. The present value of the loan is approximately $318 million.
The Debtors were in default under covenants in the Loan Agreement as of December 31, 2007, and defaulted on a loan payment in September 2008. All of the Debtors besides PMH Holdings filed voluntary petitions under Chapter 11 of the Bankruptcy Code on February 22, 2009. PMH Holdings, the parent company, filed in June 2009. Currently, the Debtors control their businesses and property as debtors in possession.
On August 20, 2009, the Debtors filed a joint Chapter 11 plan of reorganization (the “Plan”). The Plan provides that substantially all of the Debtors’ assets will be sold at a public auction and that the assets would transfer free of liens. Debtors simultaneously signed an asset purchase agreement with Philly Papers, LLC (the “Stalking Horse Bidder”). A majority interest in the Stalking Horse Bidder is held by the Carpenters Pension and Annuity Fund of Philadelphia and Vicinity (“Carpenters”) and Bruce Toll. The Carpenters own approximately 30% of the equity in debtor PMH Holdings, LLC and Toll owned approximately 20% of the equity in PMH Holdings, LLC until the day before the asset purchase agreement was signed.
*302 Under the Plan, the purchase will generate approximately $37 million in cash for the Lenders. Additionally, the Lenders will receive the Debtors’ Philadelphia headquarters which the Debtors have valued at $29.5 million, subject to a two-year rent free lease for the entity that will operate the newspapers. The Lenders would receive any cash that is generated by a higher bid at the public auction.[3]
The Debtors filed a motion for approval of bid procedures on August 28, 2009. As part of the motion, the Debtors sought to preclude the Lenders from “credit bidding” for the assets.[4] Instead, the Debtors insisted that any qualified bidder fund its purchase with cash. In their motion to the Court, Debtors stated the basis for their procedures:
The Plan sale is being conducted under section 1123(a) and (b) of the Bankruptcy Code, and not section 363 of the Bankruptcy Code. As such, no holder of a lien on any asset of the Debtors shall be permitted to credit bid pursuant to section 363(k) of the Bankruptcy Code.
(App.1291.) Objections to the motion were filed by the Lenders, the Creditors’ Committee, the Office of the United States Trustee, the Pension Benefit Guaranty Corporations, and other creditors and debtor pension plans.
On October 8, 2009, the Bankruptcy Court issued an order refusing to bar the lenders from credit bidding. In re Philadelphia Newspapers, LLC, No. 09-11204, 2009 WL 3242292 (Bankr.E.D.Pa. Oct. 8, 2009). The Court reasoned that while the Plan proceeded under the “indubitable equivalent” prong of § 1129(b)(2)(A)(iii), it was structured as a § 1129(b)(2)(A)(ii) plan sale in every respect other than credit bidding. Reading § 1129(b)(2)(A) in light of other provisions of the Code — specifically §§ 363(k) and 1111(b) — the Court determined that any sale of the Debtors’ assets required that a secured lender be able to participate in a sale by credit bidding its debt.
The Bankruptcy Court then approved a revised set of bid procedures without the ban on credit bidding on October 15, 2009. The revised bid procedures specifically allowed the Lenders to bid their secured debt up to $318,763,725. The Bankruptcy Court’s ruling was appealed to the District Court.
On November 10, 2009, the District Court reversed the Bankruptcy Court. In re Philadelphia Newspapers, LLC, 418 B.R. 548 (E.D.Pa.2009) [hereinafter Dist. Ct. slip op.]. It disagreed with the Bankruptcy Court’s interpretation of § 1129(b)(2)(A) and held that the Code provides no legal entitlement for secured lenders to credit bid at an auction sale pursuant to a reorganization plan.
The District Court relied on the plain language of § 1129(b)(2)(A), which provides three distinct routes to plan confirmation — retention of liens and deferred cash payments under subsection (i), a free and clear sale of assets subject to credit bidding under subsection (ii), or provision *303 of the “indubitable equivalent” of the secured interest under subsection (iii). The Court reasoned that these three routes were independent prongs, separated by the disjunctive “or,” and therefore each was sufficient for confirmation of a plan as “fair and equitable” under the Code. Because the right to credit bid was not incorporated into subsection (iii), as it was in subsection (ii), Congress did not intend that a debtor who proceeded under the third prong would be required to permit credit bidding. Instead, subsection (iii) required only that a debtor provide secured lenders with the “indubitable equivalent” of their secured interest in the assets. The District Court pointed out that this broad language served as an “invitation to debtors to craft an appropriate treatment of a secured creditor’s claim, separate and apart from the provisions of subsection (ii).” Dist. Ct. slip op. at 568. As such, “a plan sale is potentially another means to satisfy this indubitable equivalent standard.” Id. at 568-69.
The District Court’s order was appealed to us along with a motion for a stay. We granted the stay on November 17, 2009, pending resolution of this appeal on the merits.
II.
The District Court had jurisdiction under 28 U.S.C. § 158(a)(3) over the appeal from the Bankruptcy Court,[5] which had jurisdiction under 28 U.S.C. § 157(b). We have jurisdiction under 28 U.S.C. § 158(d).
We exercise plenary review over the District Court’s conclusions of law, including matters of statutory interpretation. In re Tower Air, Inc., 397 F.3d 191, 195 (3d Cir.2005) (citing In re Prof'l Ins. Mgmt, 285 F.3d 268, 282-83 (3d Cir.2002)). Because the District Court sat as an appellate court to review the Bankruptcy Court’s ruling, we review the Bankruptcy Court’s legal determinations de novo, its factual findings for clear error, and its exercises of discretion for abuse thereof. Id. (citing In re Engel, 124 F.3d 567, 571 (3d Cir.1997)).
III.
Chapter 11 of the Bankruptcy Code strikes a balance between two principal interests: facilitating the reorganization and rehabilitation of the debtor as an economically viable entity, and protecting creditors’ interests by maximizing the value of the bankruptcy estate. See In re Integrated Telecom Express, Inc., 384 F.3d 108, 119 (3d Cir.2004) (citing Bank of Am. Nat’l Trust & Sav. Ass’n v. 203 N. LaSalle St. P’ship, 526 U.S. 434, 453, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999)). In furtherance of those objectives, the Code permits a debtor preparing a Chapter 11 reorganization plan to “provide adequate means for the plan’s implementation” including arranging for the “sale of all or any part of the property of the estate, either subject to or free of any lien[.]” 11 U.S.C. § 1123(a)(5)(D). We are asked in this appeal to determine what rights a secured lender has when its collateral is sold pursuant to § 1123(a)(5)(D).
As a starting point for our analysis, we note that the “plan sale” authorized by § 1123(a)(5)(D) contains no explicit procedures for the sale of assets that secure debts of the estate. Lacking direct authority, we look to the plan confirmation provision of the Code, § 1129(b), to determine what requirements the court will later have to find are satisfied in order to *304 confirm the plan, including the asset sale. The meaning of § 1129(b), and what rights it confers on secured lenders as a matter of law, is thus the central question in this appeal. Because § 1129(b) unambiguously permits a court to confirm a reorganization plan so long as secured lenders are provided the “indubitable equivalent” of their secured interest, we will affirm the District Court.
The Lenders offer three principal arguments in support of their right to credit bid at the auction of the assets securing then- loan: First, they contend that the plain language of § 1129(b)(2)(A), in light of applicable canons of statutory interpretation, requires that all sales of assets free and clear of liens must proceed under subsection (ii) of that provision, which includes the right to credit bid. Second, they argue that subsection (iii) calling for the “indubitable equivalent” of a lender’s secured interest is ambiguous, requiring resort to other provisions of the Code that purportedly confirm the Lenders’ right to credit bid. Finally, they argue that denying secured lenders a right to credit bid is inconsistent with other provisions of the Bankruptcy Code. We will address each argument in turn.
A. The Plain Meaning of Section 1129(b)(2)(A) Permits a Debtor to Conduct an Asset Sale Under Subsection (iii) Without Allowing Secured Lenders to Credit Bid
It is the cardinal canon of statutory interpretation that a court must begin with the statutory language. “[CJourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then this first canon is also the last: judicial inquiry is complete.” Conn. Nat’l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (internal citations and quotations omitted); see also Price v. Del. State Police Fed. Credit Union, 370 F.3d 362, 368 (3d Cir.2004) (“We are to begin with the text of a provision and, if its meaning is clear, end there.”). Where the statutory language is unambiguous, the court should not consider statutory purpose or legislative history. See AT&T, Inc. v. F.C.C., 582 F.3d 490, 498 (3d Cir.2009).
In determining whether language is unambiguous, we “read the statute in its ordinary and natural sense.” Harvard Secured Creditors Liquidation Trust v. I.R.S., 568 F.3d 444, 451 (3d Cir.2009). A provision is ambiguous only where the disputed language is “reasonably susceptible of different interpretations.” Dobrek v. Phelan, 419 F.3d 259, 264 (3d Cir.2005) (quoting Nat’l R.R. Passenger Corp. v. Atchinson Topeka & Santa Fe Ry. Co., 470 U.S. 451, 473 n. 27, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985)).
 With that framework in mind, we turn to the language of § 1129(b)(2)(A). Section 1129(b) provides circumstances under which a reorganization plan can be confirmed over the objection of secured creditors — a process referred to as a “cramdown” because the secured claims are reduced to the present value of the collateral, while the remainder of the debt becomes unsecured, forcing the secured creditor to accept less than the full value of its claim and thereby allowing the plan to be “crammed down the throats of objecting creditors.” Kham & Nate’s Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1359 (7th Cir.1990) (Easterbrook, J.). Section 1129(b)(1) requires the court to assess whether the proposed treatment of the secured claims is “fair and equitable.” 11 U.S.C. § 1129(b)(1).
*305 Section 1129(b)(2)(A) provides three circumstances under which a plan is “fair and equitable” to secured creditors:
(A) With respect to a class of secured
claims, the plan provides—
(i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder’s interest in the estate’s interest in such property-
(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this sub-paragraph; or
(iii)for the realization by the holders of the indubitable equivalent of such claims.
11 U.S.C. § 1129(b)(2)(A)(i)-(iii) (emphasis added).
The three subsections of § 1129(b)(2)(A) each propose means of satisfying a lender’s lien against assets of the bankruptcy estate. Subsection (i) provides for the transfer of assets with the liens intact and deferred cash payments equal to the present value of the lender’s secured interest in the collateral. Subsection (ii) provides for the sale of the collateral that secures a lender free and clear of liens so long as the lender has the opportunity to “credit bid” at the sale (i.e., offset its bid with the value of its secured interest in the collateral) with the liens to attach to the proceeds of the sale.[6] Subsection (iii) provides for the realization of the claim by any means that provides the lender with the “indubitable equivalent” of its claim.
The Lenders concede, as they must, that § 1129(b)(2)(A) is phrased in the disjunctive. The use of the word “or” in this provision operates to provide alternatives — a debtor may proceed under subsection (i), (ii), or (iii), and need not satisfy more than one subsection. This approach is consistent with the definitions provided by the Code. Section 102(5) provides “that ‘or’ is not exclusive!)]” 11 U.S.C. § 102(5). The statutory note to § 102(5) further explains that “if a party ‘may do (a) or (b)’, then the party may do either or both. The party is not limited to a mutually exclusive choice between the two alternatives.” 11 U.S.C. § 102 hist. n. (West 2004) (Revision Notes and Legislative Reports); see also H.R.Rep. No. 95-595, at 315 (1977) as reprinted in 1978 U.S.C.C.A.N. 5963, 6272; S.Rep. No. 95-989, at 28 (1978) as reprinted in 1978 U.S.C.C.A.N. 5787, 5814. Thus, any doubt as to whether subsections (i), (ii), and (iii) were meant to be alternative paths to meeting the fair and equitable test of § 1129(b)(2)(A) is resolved by the Bankruptcy Code itself, and courts have followed this uncontroversial mandate. *306 See, e.g., Pacific Lumber, 584 F.3d at 245 (affirming “the obvious proposition that because the three subsections of § 1129(b)(2)(A) are joined by the disjunctive ‘or,’ they are alternatives”); Wade v. Bradford, 39 F.3d 1126, 1130 (10th Cir.1994) (“These requirements [of § 1129(b)(2)(A)] are written in the disjunctive, requiring the plan to satisfy only one before it could be confirmed over creditor’s objection.”); In re Brisco Enters., Ltd. II, 994 F.2d 1160, 1168 (5th Cir.1993) (holding that the court “has not transformed the ‘or’ in 1129(b)(2)(A) to an ‘and’ ”); accord Corestates Bank, N.A. v. United Chem. Techs., Inc., 202 B.R. 33, 50 (E.D.Pa.1996) (“Courts consider Congresses’ use of the disjunctive ‘or’ between subsections (i), (ii), and (iii) indicative of Congressional intent that only one of the three subsections need be satisfied in order to find a plan fair and equitable.”).
Though the ordinary operation of the word “or” is not genuinely disputed among the parties,[7] the Lenders rely on a traditional canon of statutory interpretation— that the specific term prevails over the general term — to argue that a plan sale of assets free and clear of liens must comply with the more specific requirements of subsection (ii). In other words, the proposed treatment of collateral determines which of the § 1129(b)(2)(A) alternatives is applicable. Under this interpretation, any Chapter 11 plan proposing the transfer of assets encumbered by their original liens must proceed under subsection (i), any plan proposing the free and clear sale of assets must proceed under subsection (ii), and only those plans proposing a disposition not covered by subsections (i) and (ii), most notably the substitution of collateral, may then proceed under subsection (iii). This reasoning dictates that, because the Plan includes a sale of collateral free and clear of liens, the Lenders would have a statutory right to credit bid pursuant to the express terms of subsection (ii).
It is “a well-settled maxim that specific statutory provisions prevail over more general provisions.” In re Combustion Eng’g, 391 F.3d 190, 237 n. 49 (3d Cir.2004). In Combustion Engineering, we applied this principle to hold that the broad equitable authority granted to bankruptcy courts by § 105(a) to issue “any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title,” 11 U.S.C. § 105(a), could not be used to circumvent the express limitations of § 524(g), which enumerated limited circumstances under which the court could enjoin suits against non-debtors whose asbestos liabilities were derivative of the debtor’s, 11 U.S.C. *307 § 524(g)(4)(a)(ii). Accordingly, we vacated an injunction precluding suit against non-debtors whose liabilities did not fall within those articulated in § 524(g), notwithstanding the court’s more general equitable authority under § 105(a).
However, the Supreme Court has cautioned that “[t]o apply a canon properly one must understand its rationale.” Varity Corp. v. Howe, 516 U.S. 489, 511, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). The principle motivating the outcome in Combustion Engineering was “a warning against applying a general provision when doing so would undermine limitations created by a more specific provision.” 391 F.3d at 237 n. 49 (quoting Varity Corp., 516 U.S. at 511, 116 S.Ct. 1065) (emphasis added). Thus, the principle is only applicable here if we find that the specificity of subsection (ii) operates as a limitation on the broader language in subsection (iii). We believe it does not.
The Supreme Court has addressed a nearly identical argument, albeit under a different statutory scheme, and held that a specific enumeration followed by a broader “catchall” provision does not require application of the more specific provision. Varity Corp., 516 U.S. at 511-12, 116 S.Ct. 1065. The question in Varity Corp. was whether § 502(a)(3) of ERISA authorized individual relief when plan beneficiaries sued for breach of fiduciary duty. ERISA’s remedial provision provides, in relevant part:
Sec. 502. (a) A civil action may be brought — ...
(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title; [or]
(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this sub-chapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]
29 U.S.C. § 1132(a). Section 1109, describing the relief available under subsection (2), is titled “Liability for Breach of Fiduciary Duty” and provides that any individual who breaches a fiduciary duty is personally liable to “make good to such plan any losses to the plan.” 29 U.S.C. § 1109(a). Prior Supreme Court analysis made clear that this language limited relief to restitution to the plan, and thereby precluded individual relief under § 1109(a). See Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 144, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). Plaintiffs, as participants and beneficiaries of the plan, sued Varity under subsection (3) alleging breach of fiduciary duty and seeking individual equitable relief.
The argument advanced by Varity mirrored the argument advanced by the Lenders here: Varity argued that, because subsection (2) specifically pertains to breaches of fiduciary duty, and because it incorporates the § 1109(a) prohibition on individual recovery, the plaintiffs could not avail themselves of the more general subsection (3) when their suit was premised on breach of fiduciary duty. To permit as much, Varity argued, was to allow a circumvention of subsection (2)’s restrictions on individual relief.
The Supreme Court rejected this argument. Considering the application of the canon “the specific governs the general,” the Court reasoned that it only applied where the more specific provision clearly placed a limitation on the general. 516 U.S. at 511, 116 S.Ct. 1065. The Court observed no such limitation in the narrower provision of subsection (2):
To the contrary, one can read [§ 1109] as reflecting a special congressional con *308 cern about plan asset management without also finding that Congress intended that section to contain the exclusive set of remedies for every kind of fiduciary breach.... Why should we not conclude that Congress provided yet other remedies for yet other breaches of other sorts of fiduciary obligations in another, “catchall” remedial section?
Id. at 511-12, 116 S.Ct. 1065. The plaintiffs were thus permitted to proceed under subsection (3) and seek individual equitable relief for the alleged breach of fiduciary duty.
The Court’s reasoning in Varity Corp. helps to resolve our inquiry into the relationship between the subsections of § 1129(b)(2)(A). Although subsection (ii) specifically refers to a “sale” and incorporates a credit bid right under § 363(k), we have no statutory basis to conclude that it is the only provision under which a debtor may propose to sell its assets free and clear of liens. While the proposed disposition of assets in subsection (ii) may reflect “a special congressional concern” about the free and clear transfer of collateral that secures a loan, Varity Corp., 516 U.S. at 511, 116 S.Ct. 1065, this does not lead inexorably to the conclusion that Congress meant for subsection (ii) to be the exclusive means through which such collateral is transferred. Just as the Court in Varity Corp. concluded that the “catchall” provision permitted “yet other remedies for yet other breaches of other sorts of fiduciary obligations,” 516 U.S. at 512, 116 S.Ct. 1065, it is apparent here that Congress’ inclusion of the indubitable equivalence prong intentionally left open the potential for yet other methods of conducting asset sales, so long as those methods sufficiently protected the secured creditor’s interests. Accord In re CRIIMI MAE, Inc., 251 B.R. 796, 807 (Bankr.D.Md.2000) (“11 U.S.C. § 1129(b)(2)(A) plainly indicates that subsections (i), (ii) and (iii) are to be treated as distinct alternatives. As a result, the provisions are not in conflict and the [‘specific governs the general’] rule of construction is inapplicable.”).[8]
The Lenders’ argument in this regard elevates form over substance. A proposed plan of reorganization, even one that fully compensates lenders for their secured interest, would necessarily fail under their *309 reading if the plan proposed a free and clear asset sale without complying with the additional requirements of subsection (ii). Reading the statute in this manner significantly curtails the ways in which a debtor can fund its reorganization — an outcome at odds with the fundamental function of the asset sale, to permit debtors to “provide adequate means for the plan’s implementation.” 11 U.S.C. § 1123(a)(5)(D); see also Varity Corp., 516 U.S. at 513, 116 S.Ct. 1065 (rejecting a limited reading of the “catchall” provision because “ERISA’s basic purposes favor a reading of the third subsection that provides the plaintiffs with a remedy”).
The Fifth Circuit in Pacific Lumber, 584 F.3d 229, reached this same conclusion. The transaction in Pacific Lumber was an inside transfer of assets to the reorganized entities, free and clear of the liens, which the Fifth Circuit determined was a sale under the Code. Id. at 245. In exchange, the secured lenders received the full cash equivalent of their undersecured claims but were not permitted to bid their credit to attain possession of the assets. The secured lenders objected to the confirmation of the plan based on their inability to credit bid.
In analyzing the confirmation, the Fifth Circuit required the creditors to “do more than show that Clause (ii) theoretically applied to this transaction. They have to demonstrate its exclusive applicability.” Id. The court reasoned that the creditors could not demonstrate the exclusive application of subsection (ii) because the three subsections of § 1129(b)(2)(A) were “alternatives” and “not even exhaustive” of the ways in which a debtor might satisfy the “fair and equitable” requirement. Id. Thus, even though the debtors’ proposed asset transfer was a “sale” under the Code, the court did not limit the debtors to confirmation under subsection (ii). Id. at 245-46. Rather, the court looked to whether the transaction satisfied the requirements of subsection (iii). Id. at 246. Because the proposed cash payout of the value of the collateral provided the secured lenders with the “indubitable equivalent” of their claims, the plan was confirmable under subsection (iii) notwithstanding its structure as an asset sale and the exclusion of the secured lenders’ right to credit bid. Id. at 246-47.
The court’s approach in Pacific Lumber focuses on fairness to the creditors over the structure of the cramdown. Under the scheme proposed by the Lenders, because the Pacific Lumber plan involved a sale of assets, the debtor would be required to proceed under subsection (ii); and, if it could not meet the subsection (ii) requirements, then the plan could not be confirmed. The Fifth Circuit instead took the more flexible approach, consistent with the disjunctive nature of the statute, that a plan could be confirmed so long as it met any one of the three subsections’ requirements, regardless of whether the plan’s structure more closely resembled another subsection. Id.; accord Corestates Bank, 202 B.R. at 50 (holding that a plan permitting retention of liens on some but not all collateral could not proceed under subsection (i) and remanding for consideration of whether the plan provided the indubitable equivalent under subsection (iii)); CRIIMI MAE, 251 B.R. at 806 (rejecting argument that “no plan that contemplates the sale of collateral of a dissenting class of secured claims can be found ‘fair and equitable’ unless it complies with section 1129(b)(2)(A)(ii)”).
This approach recognizes that Congress’ use of “or” in § 1129(b)(2)(A) was not without purpose. A plan of reorganization cannot be confirmed over the objection of secured lenders unless it is “fair and equitable.” 11 U.S.C. § 1129(b)(1). To guide *310 courts in interpreting that standard, Congress provided examples: a transfer of lien-encumbered assets with deferred cash payments, a free and clear sale of assets subject to credit bidding, or any other disposition that provides lenders with the “indubitable equivalent” of their secured interest. The final option elevates fair return to the lenders over the methodology the debtor selects to achieve that return, and invites debtors “to craft an appropriate treatment of a secured creditor’s claim, separate and apart from the provisions of subsection (ii).” Dist. Ct. slip op. at 568. We have no statutory basis for concluding that such flexibility, consistent with both the language and purpose of the Code, should be curtailed.
B. Subsection (iii)’s “Indubitable Equivalent” Language Unambiguously Excludes the Right to Credit Bid
Next, the Lenders argue that the term “indubitable equivalent” is ambiguously broad and we should therefore resort to other canons of statutory construction to determine whether a sale of collateral in the absence of credit bidding can ever provide the “indubitable equivalent” of the secured interest.
The term “indubitable equivalent,” while infrequently employed in popular parlance, was not plucked from the congressional ether. Judge Learned Hand first coined the phrase “indubitable equivalent” in his opinion In re Murel Holding Corp., 75 F.2d 941, 942 (2d Cir.1935). In that opinion, Judge Hand rejected a debtor’s offer to repay the balance of a secured debt in a balloon payment ten years after plan confirmation with interim interest payments but no requirements to protect the collateral. Judge Hand reasoned that, under the Bankruptcy Act of 1898, a secured creditor could not be deprived of his collateral “unless by a substitute of the most indubitable equivalence.” Id. This phrase was later added to the Bankruptcy Code. The phrase, as the Fifth Circuit noted, is “rarely explained in caselaw, because most contested reorganization plans follow familiar paths outlined in Clauses (i) and (ii).” Pacific Lumber, 584 F.3d at 246.
As a general matter of statutory construction, a term in a statute is not ambiguous merely because it is broad in scope. See Penn. Dep’t of Corrections v. Yeskey, 524 U.S. 206, 212, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998). In employing intentionally broad language, Congress avoids the necessity of spelling out in advance every contingency to which a statute could apply. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 499, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (holding that the fact that a statute can be “applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.”).
Though broad, the phrase “indubitable equivalent” is not unclear. Indubitable means “not open to question or doubt,” Webster’s Third New Int’l Dictionary 1154 (1971), while equivalent means one that is “equal in force or amount” or “equal in value,” id. at 769. The Code fixes the relevant “value” as that of the collateral. See 11 U.S.C. § 1129(b)(2)(A)(iii) (requiring the “indubitable equivalent” of the secured claim); id. § 506(a) (defining a secured claim as “the extent of the value of such creditor’s interest in the estate’s interest in such property”). Thus the “indubitable equivalent” under subsection (iii) is the unquestionable value of a lender’s secured interest in the collateral.
Further, the scope of the “indubitable equivalent” prong is circumscribed by the same principles that underlie subsections (i) and (ii), specifically, the protection of a *311 fair return to secured lenders.[9] As the Fifth Circuit reasoned:
Congress did not adopt indubitable equivalent as a capacious but empty semantic vessel. Quite the contrary, these examples focus on what is really at stake in secured credit: repayment of principal and the time value of money. Clauses (i) and (ii) explicitly protect repayment to the extent of the secured creditors’ collateral value and the time value compensating for the risk and delay of repayment. Indubitable equivalent is therefore no less demanding a standard than its companions.
Pacific Lumber, 584 F.3d at 246.
Applying this standard, courts have concluded in a variety of circumstances that a debtor has provided the “indubitable equivalent” of a secured lender’s claim. See id. at 246 (holding a cash payout satisfied the “indubitable equivalent” prong); In re Sun Country, 764 F.2d 406, 409 (5th Cir.1985) (holding 21 notes secured by 21 lots of land was the “indubitable equivalent” of a first lien on a 200 acre lot); accord CRIIMI MAE, 251 B.R. at 807-08 (holding exchange of collateral satisfied the “indubitable equivalent” prong); see also Kenneth N. Klee, All You Ever Wanted to Know About Cram Down under the Bankruptcy Code, 53 Am. Bankr.L.J. 133, 156 (1979) (hypothesizing that “[a]bandonment of the collateral to the class would satisfy [indubitable equivalent], as would a replacement lien on similar collateral”).
Because we decline to hold that subsection (iii) is ambiguous, the Lenders may only assert a right to credit bid under subsection (iii) if that right is contained in the plain language of the statute. Section 1129(b)(2)(A)(iii) states that a plan of reorganization is fair and equitable if it provides “for the realization by the holders of the indubitable equivalent of [allowed secured] claims.” Subsection (iii), unlike subsection (ii), incorporates no reference to the right to credit bid created in § 363(k). A plain reading of § 1129(b)(2)(A)(iii) therefore compels the conclusion that, when a debtor proceeds under subsection (iii), Congress has provided secured lenders with no right to credit bid at a sale of the collateral.
The Lenders counter this conclusion by arguing that, even if subsection (iii) contains no explicit right to credit bid, that right is necessary to providing secured lenders with the “indubitable equivalent” of their claims. This argument is premised on our decision in In re SubMicron Systems Corp., 432 F.3d 448 (3d Cir.2006), where we held that credit bidders in a § 363(b) sale could bid up to the full value of their loan, and that the amount of the credit bid became the value of the lender’s secured interest in the collateral. In light of SubMicron, the Lenders ask us to hold that a secured lender who is not allowed to credit bid can never receive the “indubitable equivalent” of its secured interest because its credit bid sets the value of the collateral.
The Lenders’ argument is well-taken that determining whether a secured lender has received the full value of its interest in the collateral is more complicated when the collateral undersecures the debt. To illustrate the distinction: A lender who makes a loan of $100 secured by a lien against a truck worth $500 indisputably has a secured interest of $100. If the value of the truck depreciates such that, at the time of bankruptcy, the truck is worth *312 less than $100, then the lender has a secured interest only up to the “value” of the truck. The source of this “value” is central to this dispute to the extent that it informs whether a lender has received the indubitable equivalent of its secured interest.
SubMicron is consistent with our analysis in this case. Our holding that a credit bid sets the value of a lender’s secured interest in collateral does not equate to a holding that a credit bid must be the successful bid at a public auction. Rather, a court is called at plan confirmation to determine only whether a lender has received the “indubitable equivalent” of its secured interest. Logically, this can include not only the cash value generated by the public auction, but other forms of compensation or security such as substituted collateral or, as here, real property. In other words, it is the plan of reorganization, and not the auction itself, that must generate the “indubitable equivalent.” For this reason, the District Court noted that Lenders “retain the right to argue at confirmation, if appropriate, that the restriction on credit bidding failed to generate fair market value at the Auction, thereby preventing them from receiving the indubitable equivalent of their claim.” Dist. Ct. slip op. at 574-75.
Although the Lenders contend that our approach here is anomalous, the case law favors the Debtors. While the reasoning in the myriad cases touching upon this issue is admittedly inconsistent, no case cited by the Lenders reaches the conclusion they advance here: that credit bidding is required when confirmation is sought under subsection (iii). See, e.g., In re River Village, 181 B.R. 795, 805 (E.D.Pa.1995) (permitting credit bidding in a § 363(b) pre-confirmation sale but confirming the reorganization under subsection (i)); In re California Hancock, 88 B.R. 226, 230 (9th Cir.BAP1988) (requiring credit bidding where confirmation was sought under subsection (i)). Rather, most cases addressing the right to credit bid have concluded, in keeping with the express language of the statute, that such right arises when confirmation is sought under subsection (ii). See, e.g., In re Kent Terminal, 166 B.R. 555, 566-67 (Bankr.S.D.N.Y.1994) (holding that “the lienholder has the unconditional right to bid in its lien” under subsection (ii)).
On the other hand, the Fifth Circuit has specifically addressed whether a lender had a right to credit bid under subsection (iii) and concluded that it did not. See Pacific Lumber, 584 F.3d at 246. As discussed above, the court in Pacific Lumber confirmed a sale of assets at private auction by determining that the cash payout to the noteholders provided the “indubitable equivalent” of their secured interest in the assets, notwithstanding a provision barring secured lenders from credit bidding. 584 F.3d at 246. Though Pacific Lumber was a plan confirmation case, its holding on the threshold requirements of § 1129(b)(2)(A) speaks to our inquiry here — specifically, that a debtor may proceed with a sale under subsection (iii) without permitting secured lenders to credit bid. Accord CRIIMI MAE, 251 B.R. at 807 (reasoning that § 1129(b)(2)(A) permitted a debtor to proceed with a sale free and clear of liens under subsection (ii) or (iii), and that because only subsection (ii) required credit bidding, a sale that proceeded under subsection (iii) need only satisfy the “indubitable equivalent” requirement).
This rule, which proceeds from the plain language of the statute, is not akin to guaranteeing plan confirmation. We are asked here not to determine whether the “indubitable equivalent” would necessarily be satisfied by the sale; rather, we are *313 asked to interpret the requirements of § 1129(b)(2)(A) as a matter of law. This distinction is critical. The auction of the Debtors’ assets has not yet occurred. Other public bidders may choose to submit a cash bid for the assets. The value of the real property that the Lenders will receive, in addition to cash, under the terms of the proposed plan has not yet been established. And the secured claim itself has not yet been judicially valued under § 506(a).[10] We are simply not in a position at this stage to conclude, as a matter of law, that this auction cannot generate the indubitable equivalent of the Lenders’ secured interest in the Debtors’ assets. We approve the proposed bid procedures with full confidence that such analysis will be carefully and thoroughly conducted by the Bankruptcy Court during plan confirmation, wThen the appropriate information is available.
Finally, in holding that § 1129(b)(2)(A) is not ambiguous, we are cognizant of our dissenting colleague’s strenuous admonition that two esteemed courts below have reached opposite, and presumably “reasonable,” interpretations of this statutory language. Dissent op. Part II. However, as Justice Thomas has observed, “[a] mere disagreement among litigants over the meaning of a statute does not itself prove ambiguity; it usually means that one of the litigants is simply wrong.” Bank of A Nat’l Trust & Sav. Ass’n v. 208 N. LaSalle St. P’ship, 526 U.S. 434, 461, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1991) (Thomas, J„ concurring). The same is true of disagreements among courts. See, e.g., In re Ford, 574 F.3d 1279, 1293 (10th Cir.2009) (“Case law (including this very opinion) shows that courts can reasonably disagree on the meaning of the term under various state laws. But the plain language of [this provision] is clear, making resort to its legislative history unnecessary and potentially misleading.”). We decline to hold that a statutory provision is ambiguous as a matter of law merely because two admittedly well-reasoned opinions below reached opposite conclusions. Were this the case, this Court would never be permitted to reverse on plain language grounds a district court’s holding that a provision is ambiguous because the district court’s reasonable disagreement would itself create an ambiguity. Clearly this is not the case. See, e.g., First Merchants Acceptance Corp. v. J.C. Bradford & Co., 198 F.3d 394, 398 (3d Cir.1999) (reversing district court holding, following California Bankruptcy Court opinion, that 11 U.S.C. § 503(b)(4) was ambiguous, holding instead that statutory language was subject to only one reasonable interpretation).
Because the language of § 1129(b)(2)(A) is unambiguous — both as to the non-exclusive enumeration of permissible treatments of secured claims, and the inclusion of a broad but not meaningless option to *314 provide the “indubitable equivalent” of secured interests — we will affirm the District Court.
C. The Plain Meaning of § 1129(b)(2)(A) is Not Inconsistent with Congressional Intent
Our opinion could stop with a plain language analysis, however, we are cognizant that the Supreme Court has recognized a narrow exception to the plain meaning rule in the “rare cases [where] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.” United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); see also Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) (permitting a “restricted rather than a literal or usual meaning of [statutory] words where acceptance of that meaning ... would thwart the obvious purpose of the statute”); Morgan v. Gay, 466 F.3d 276, 277-78 (3d Cir.2006) (noting “in that rare instance where it is uncontested that legislative intent is at odds with the literal terms of the statute, then a court’s primary role is to effectuate the intent of Congress even if a word in the statute instructs otherwise”).[11] Generally, where the text of a statute is unambiguous, the statute should be enforced as written and “[o]nly the most extraordinary showing of contrary intentions in the legislative history will justify a departure from that language.” United States v. Albertini, 472 U.S. 675, 680, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985) (internal quotation omitted). We find no extraordinary showing of contrary intent that warrants deviation from the plain text of the statute.
The bulk of the Lenders’ arguments, as well as the weight of the Bankruptcy Court’s reasoning, rely on the way in which §§ 1111(b) and 363(k) inform a lender’s right to credit bid at the sale of the debtor’s assets. The Lenders argue that the Code guarantees a secured lender one of two rights — either the right to elect to treat them deficiency claims as secured under § 1111(b) or the right to bid their credit under § 363(k). Because the Lenders are statutorily precluded from making a § 1111(b) election,[12] they contend that they must be afforded the right to credit bid at the auction.
A summary of the relevant statutory provisions informs our analysis. Section 363 establishes certain rights and procedures in connection with, inter alia, the sale of debtor assets. Section 363(b) provides that the trustee “after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.” 11 U.S.C. § 363(b). Such a sale is subject to the secured lender protections of § 363(k), which provide that:
At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.
11 U.S.C. § 363(k). As discussed above, this is commonly referred to as the right *315 to “credit bid” and is incorporated by reference into § 1129(b)(2)(A)(ii).
Section 1111(b) covers the treatment of certain claims and interests of bankruptcy creditors, and provides unique protections to undersecured lenders.[13] Specifically § 1111(b)(1)(A) is an exception to the general rule that creditors who do not have recourse to the debtor are entitled to nothing more than the realization of their collateral. Under § 1111(b), Congress provided the option for nonrecourse creditors to have their deficiency claims treated as secured debt. This is a deviation from the process provided for in § 506(a), under which the claim of an undersecured creditor is divided into: (1) a secured claim equal to the court-determined value of the collateral seeming the claim, and (2) an unsecured claim for the deficiency. 11 U.S.C. § 506(a)(1). A nonrecourse creditor who makes a § 1111(b) election would be permitted to treat its deficiency claim as secured. 11 U.S.C. § 1111(b)(2).
The § 1111(b) election is not available to recourse creditors when the property is sold under § 363 or under a plan of reorganization. 11 U.S.C. § llll(b)(l)(B)(ii). As recourse creditors whose collateral is being sold under a plan, the Lenders are not eligible to make a § 1111(b) election. They argue that the exemption of secured recourse creditors from the § 1111(b) election is limited to situations in which they have the opportunity to credit bid: specifically, a § 363 sale, under which their right to credit bid is preserved by § 363(k), and a plan of reorganization, under which their right to credit bid is incorporated into § 1129(b)(2)(A)(ii). The import of these two exceptions, according to the Lenders, is that Congress clearly intended that any sale of collateral — -whether under § 363 or a plan of reorganization — would permit credit bidding by secured lenders.
This argument fails in light of the plain language and operation of the Code. As an initial matter, the Code plainly contemplates situations in which estate assets encumbered by liens are sold without affording secured lenders the right to credit bid. The most obvious example arises in the text of § 363(k), under which the right to credit bid is not absolute. A secured lender has the right to credit bid “unless the court for cause orders otherwise.” 11 U.S.C. § 363(k). In a variety of cases where a debtor seeks to sell assets pursuant to § 363(b), courts have denied secured lenders the right to bid their credit. See In re Aloha Airlines, No. 08-00337, 2009 WL 1371950, at *8 (Bankr.D.Hawaii May 14, 2009) (determining that “cause *316 exists to deny the credit bid” under § 363(k)); Greenblatt v. Steinberg, 339 B.R. 458, 463 (N.D.Ill.2006) (holding the “bankruptcy court did not err in refusing to allow [a secured creditor] to credit bid”); In re Antaeus Technical Servs., Inc., 345 B.R. 556, 565 (Bankr.W.D.Va.2005) (denying right to credit bid to facilitate “fully competitive” cash auction); In re Theroux, 169 B.R. 498, 499 n. 3 (Bankr.D.R.I.1994) (noting that “there is no absolute entitlement to credit bid”).[14]
At the heart of the Lenders’ argument is the notion that the combined import of § 1111(b) and § 363(k) is a special protection afforded to secured lenders to recognize some value greater than their allowed secured claim' — either by treating their unsecured claim as a secured deficiency claim under § 1111(b), or bidding them credit under § 363(k) in hopes of realizing a potential upside in the collateral. Asserting an absolute right to such preferential treatment is plainly contrary to other provisions of the Code, which limit a secured lender’s recovery to the value of its secured interest even when it is not permitted to make a § 1111(b) election.[15] For instance, if a debtor proceeds with a sale of encumbered assets under subsection (i), there is no § 1111(b) election because the assets are “sold under the plan.” 11 U.S.C. § llll(b)(l)(a)(ii). However, § 1129(b)(2)(A)(i)(I) still caps the transferred lien at the value of the lender’s allowed secured claim, as established by judicial valuation under § 506(a). The deferred cash payments under § 1129(b)(2)(A)(i)(II), are also limited to the present value of the deferred payments. Thus when a debtor proceeds under subsection (i), a lender who is ineligible to make a § 1111(b) election is still limited in its recovery to the judicial valuation of its secured interest in the collateral.
As the court noted in Pacific Lumber, a secured lender’s expectation of benefitting from the eventual appreciation of collateral (the so-called “upside” of the collateral) is not an entitlement when the property is part of a bankruptcy estate:
The Bankruptcy Code ... does not protect a secured creditor’s upside potential; it protects the “allowed secured claim.” If a creditor were over-secured, it could not demand to keep its collateral rather than be paid in full simply to protect the “upside potential.”
Pacific Lumber, 584 F.3d at 247. Rather, the Code provides for a variety of treatments of secured claims, all of which are calculated to balance the interests of the secured lender and the protection of the *317 reorganized entity, and none of which ensure an advantageous return on a secured investment. These powers are necessary to allow the debtor to “emerge from bankruptcy with property cleansed of all hidden liens, ensuring that future businesses will transact with the reorganized entity without fear that an unanticipated creditor will emerge with a superior interest in purchased property.” In re Airadigm Comms., Inc., 519 F.3d 640, 649 (7th Cir.2008).
Because our plain reading of § 1129(b)(2)(A) is not at odds with the operation of §§ 1111(b) and 363(k), we may only consider the legislative history advanced by the Lenders if it evidences an “extraordinary showing of contrary intentions” by Congress. Albertini, 472 U.S. at 680, 105 S.Ct. 2897; see also Hay Group, Inc. v. E.B.S. Acquisition Corp., 360 F.3d 404, 406 (3d Cir.2004) (“The Supreme Court has repeatedly explained that recourse to legislative history or underlying legislative intent is unnecessary when a statute’s text is clear and does not lead to an absurd result.” (internal citation omitted)). There is no such “extraordinary showing” here.
The specific history on which the Lenders rely is a congressional statement made in connection with the enactment of § 1111(b). In that statement, Representative Edwards noted:
Sale of property under section 363 or under a plan is excluded from treatment under section 1111(b) because of the secured party’s right to credit bid in the full amount of its allowed claim at any sale of collateral under section 363(k) of the House Amendment.
124 Cong. Rec. 31795, 32407 (Sept. 28, 1978); 124 Cong. Rec. 33130, 34007 (identical remarks of Senator DeConcini). The Lenders contend that this statement reflects Congressional intent to ensure that secured lenders who could not make a § 1111(b) election had the ability to credit bid under § 363(k).
The present dispute aside, this statement ignores at least two uncontroverted circumstances, explained above, where a secured creditor has neither a right to make a § 1111(b) election, nor a right to credit bid under § 363(k): a transfer of encumbered assets under
§ 1129(b)(2)(A)(i)(I) and a for-cause exception to credit bidding under § 363(k). Given that this legislative history ignores these vital functions of the Code, we cannot credit it over the plain language of the statute to confer an absolute right to credit bid on all asset sales under § 1129(b)(2)(A).
Ultimately, we are left where we began — where the statutory directive is clear we are bound to enforce that directive. To the extent this holding permits a course of conduct not contemplated or not desirable under the Code, as the Lenders argue it does, it is the sole province of Congress to amend a statute that carries out by its plain language an undesirable end. See Lamie v. U.S. Trustee, 540 U.S. 526, 538, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (“Our unwillingness to soften the import of Congress’ chosen words even if we believe the words lead to a harsh outcome is longstanding.”).
Finally, our holding here only precludes a lender from asserting that it has' an absolute right to credit bid when its collateral is being sold pursuant to a plan of reorganization. Both the District Court below and the Fifth Circuit in Pacific Lumber contemplated that, in some instances, credit bidding may be required. See 584 F.3d at 247. In addition, a lender can still object to plan confirmation on a variety of bases, including that the absence *318 of a credit bid did not provide it with the “indubitable equivalent” of its collateral.[16]
IV.
Accordingly, we agree with the District Court and the Fifth Circuit that § 1129(b)(2)(A) is unambiguous and that a plain reading of its provisions permits the Debtors to proceed under subsection (iii) without allowing the Lenders to credit bid. Because we are directed to cease our inquiry when we are satisfied that the applicable statutory language is unambiguous, we will affirm the District Court on those grounds.

. The Debtors include PMH Acquisition, LLC; Broad Street Video, LLC; Philadelphia Newspapers, LLC; Philadelphia Direct, LLC; Philly Online, LLC; PMH Holdings, LLC; Broad Street Publishing, LLC; and Philadelphia Media, LLC. PMH is the parent company of all other debtors.

. The parties to this appeal are the Steering Group of Prepetition Secured Lenders, Citizens Bank of Pennsylvania as their agent, and the Official Committee of Unsecured Creditors.

. The plan also establishes a $750,000 to $1.2 million liquidating trust fund in favor of general unsecured trade creditors and provides for a distribution of 3% ownership in the successful purchaser to other general unsecured creditors if the senior lenders waive their deficiency claims. Only the plan treatment of secured lenders is the subject of this appeal, though unsecured lenders assert that they have an interest in the treatment of secured lenders under the Plan because the Lenders have agreed to waive deficiency claims if they are permitted to credit bid. (Official Committee of Unsecured Creditor's Opening Br. 23.)

. A credit bid allows a secured lender to bid its debt in lieu of cash.

. The District Court construed the filing of the appeal as an appropriate motion for leave to appeal pursuant to Fed. R. Bankr.P. 8003(c). This vested the District Court with jurisdiction over the interlocutory order. See Dist. Ct. slip op. at 556-57.

. The right to credit bid is found in § 363(k) and explicitly incorporated into subsection (ii). Section 363(k) provides:
At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.
11 U.S.C. § 363(k).

. We do note, with some confusion, our dissenting colleague’s discussion of the "exclusive” nature of "or” under certain circumstances. See Dissent op. Part II.B. We readily concede that there are circumstances where the enumerated options, though separated by "or,” necessarily preclude the selection of both — such as where a statute calls for distinct treatments "before” or "after” a specified event. See, e.g., 11 U.S.C. § 365(g)(2)(B)(i)-(ii). We also agree that a list of three options, separated by "or,” creates a type of exclusivity in that it does not permit the selection of a fourth non-enumerated option. See, e.g., Williams v. Tower Loan of Miss., Inc. (In re Williams), 168 F.3d 845, 847-48 (5th Cir.1999) (holding that where Congress has provided three permissible treatments of secured claims under 11 U.S.C. § 1325(a)(5) the parties may not construct a fourth extra-statutory option). None of these observations, however, inform our analysis here. Section 1129(b)(2)(A) provides three treatments of secured claims, none of which facially preclude the selection of any one treatment (as in the case of a statute addressing "before” and "after”). The Debtors here seek to elect one of those enumerated treatments, subsection (iii), not invent a fourth option not intended by Congress. We thus fail to see how an "exclusive” reading of "or” aids the Lenders’ position in this case.

. The Court’s reasoning in Varity Corp. also makes abundantly clear that application of a broader provision, which the court self-terms a "catchall,” 516 U.S. at 512, 116 S.Ct. 1065, does not automatically render narrower provisions superfluous. Such would only be the case where the narrower provision facially precludes application of that broader provision. Though our dissenting colleague would hold otherwise, permitting a sale of assets under subsection (iii) is not "contrary to the express terms” of subsection (ii), dissent op. Part III.A.2. Subsection (ii) provides a specific, though non-exclusive, route to a "fair and equitable” plan of reorganization. Subsection (iii) provides a more open-ended directive towards the same goal. The selection of one option does not facially negate the other (as in the case of provisions directing conduct "before” or "after,” see supra note 7). Rather, the dissent suggests that the proposed plan in this case — a free and clear sale of assets under the "indubitable equivalent” prong — will have the effect of denying secured creditors the established "fair and equitable” treatment of subsection (ii), thus demonstrating statutory conflict. This argument is not directed at the statute; it is directed at the ultimate outcome. The question of whether a particular asset sale is “fair and equitable” is a question for plan confirmation and cannot be answered at this stage by manufacturing extra-textual statutory constraints. See Pacific Lumber, 584 F.3d at 246 (“Clause (iii) does not render Clause (ii) superfluous facially or as applied to the MRC/Marathon plan. Although a credit bid option might render Clause (ii) imperative in some cases, it is unnecessary here because the plan offered a cash payment to the Noteholders. Clause (iii) thus affords a distinct basis for confirming a plan if it offered the Noteholders the ‘realization ... of the indubitable equivalent of such claims.’ ").

. The dissent misunderstands this point. See Dissent op. Part III.A.l. Subsections (i) and (ii) do not, as noted supra, operate as limitations on subsection (iii). Rather, the requirement that the disposition of assets is “fair and equitable" to secured lenders acts as an equal limitation on all subsections.

. Section 506(a) bifurcates claims into secured and unsecured claims based on judicial valuation of the collateral securing the claim. The statute directs that "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.” 11 U.S.C. § 506(a)(1). Prior to plan confirmation the Lenders’ present loan value will be bifurcated into a secured claim — based on valuation of the collateral — and an unsecured claim for the deficiency. The "indubitable equivalent” standard is tied only to the value of the secured claim. Thus, any present comparison between the $295 million loan and the value of the Stalking Horse Bid is irrelevant; the Lenders are only entitled to recover the portion of the loan that is presently secured by the value of the collateral. For this reason, we decline to engage in the dissent's attempt to assess the “value” of the proposed plan relative to the amount of the original loan. See Dissent op. Part IV. This comparison is both premature and misleading.

. In addition, we believe it is necessary to at least answer the points raised by the Lenders and relied upon by our colleague in his well-written dissent.

. Recourse lenders are exempted from making a § 1111(b) election. See 11 U.S.C. § 1111 (b)(l)(B)(ii) (exempting secured lenders from exemption if “the holder of a [secured claim] has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan”).

. The full text of § 1111(b) reads:
(b)(1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless—
(i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or
(ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.
(B) A class of claims may not elect application of paragraph (2) of this subsection if—
(i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or
(ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.
(2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

. The Lenders argue that the "for cause” exemption under § 363(k) is limited to situations in which a secured creditor has engaged in inequitable conduct. That argument has no basis in the statute. A court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment. See, e.g., 3 Collier on Bankruptcy 363.09[1] ("The Court might [deny credit bidding] if permitting the lienholder to bid would chill the bidding process.”).

. It is perhaps this point upon which our opinion and the dissent most fundamentally diverge. The dissent notes a variety of rights enjoyed by secured creditors under "longstanding nonbankruptcy law” — most notably the right to foreclose in the event of default— and then argues that "Congress extended this protection within bankruptcy.” Dissent op. Part III.B. While we agree that Congress set out certain specific protections for secured lenders, we view these protections as more evenly balanced with the overarching purpose of the Chapter 11 — to preserve the Debtor as a viable economic entity post-reorganization. Tellingly in this regard, among the immediate effects of the filing of a bankruptcy petition is a stay of all creditors' rights to foreclose on property of the debtor. See 11 U.S.C. § 362(a).

. For instance, the Lenders argue here that the Bankruptcy Court made a factual finding that the exclusion of credit bidding was not a legitimate exercise of the Debtors’ business judgment. Because the question before us is a purely legal one, and because we find no basis in the record for concluding that the Bankruptcy Court's observation was a finding of fact, we decline to address that argument here.