

**FILED**

DEC 08 2014

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No.   CC-14-1046-KiKuDa |
| ) | |
| ICE MANAGEMENT SYSTEMS, INC., ) | Bk. No.   8:13-bk-17708-TA |
| ) | |
| Debtor. ) | |
| _____ ) | |
| ) | |
| TMC AEROSPACE, INC., ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **M E M O R A N D U M**[1] |
| ) | |
| JAMES J. JOSEPH, Chapter 7 ) | |
| Trustee, ) | |
| ) | |
| Appellee. ) | |
| _____ ) | |

Argued and Submitted on September 18, 2014,
at Pasadena, California

Filed - December 8, 2014

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Theodor C. Albert, Bankruptcy Judge, Presiding

Appearances:    Daniel Joseph McCarthy of Hill, Farrer & Burrill LLP argued for appellant, TMC Aerospace, Inc.; William Miles Burd of Burd & Naylor argued for appellee, James J. Joseph, Chapter 7 Trustee.

Before:  KIRSCHER, KURTZ and DAVIS,[2] Bankruptcy Judges.

---

[1]  This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

[2]  Hon. Laurel E. Davis, Bankruptcy Judge for the District of Nevada, sitting by designation.

Secured creditor TMC Aerospace, Inc. ("TMC") appeals an order in part granting the motion of the chapter 7[3] trustee, James J. Joseph ("Trustee"), to sell certain assets of the debtor, Ice Management Systems, Inc. ("Debtor"), subject to all existing liens, interests and encumbrances under § 363(b)(1). TMC contended that its lien attached to the proceeds from the sale. The bankruptcy court ruled that because the sale was "subject to" TMC's lien, its lien was left fully intact, and no "proceeds" existed upon which TMC's lien could attach. We AFFIRM.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**A.    Prepetition events**

Debtor was in the business of manufacturing and selling devices used to de-ice aircraft. TMC is an integrated aircraft interior products and services holding company. Upon experiencing some financial difficulties, Debtor turned to TMC for funding.

TMC and Debtor entered into a series of written agreements related to the licensing of de-icing products to TMC: (a) Exclusive License Agreement; (b) Security Agreement; (c) Patent Security Agreement; and (d) Promissory Note (collectively, the "Agreement"). Under the Agreement, TMC was granted an exclusive license to use Debtor's intellectual property relating to Debtor's aircraft de-icing systems. TMC contends it advanced approximately $1.3 million to Debtor for various costs (software, payroll advances, project management costs and overhead), as well as an initial cash advance of $500,000.

---

[3] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

Trustee disputes this amount, contending TMC is owed only the $500,000 cash advance.

In exchange for the funds to Debtor, TMC was granted a blanket security interest in Debtor's tangible and intangible personal property, including its intellectual property. TMC allegedly received a first priority security interest in Debtor's assets because two of Debtor's other existing secured creditors agreed to subordinate their liens so Debtor could obtain the new funding. TMC perfected its security interest in the collateral by promptly filing a UCC-1 financial statement with the state of California.

Debtor eventually defaulted on the Promissory Note. TMC notified Debtor of its default and accelerated the entire debt. In July 2012, Debtor filed suit against TMC in state court seeking rescission and alleging claims for breach of contract and fraud. In short, Debtor contended that TMC failed to provide all of the promised funding. In response, TMC filed a cross-complaint, also alleging breach of contract and seeking to enforce the Agreement. That litigation is still pending, but was stayed once Debtor filed a bankruptcy petition. Another suit is pending in state court filed by other lienholders of Debtor who assert that TMC's security interest should be subordinate to theirs.

**B.    Postpetition events**

Debtor filed a voluntary chapter 7 bankruptcy case on September 13, 2013. Debtor valued its personal property at $10,352,993.42, which included the claim against TMC valued by Debtor at $10 million. Debtor also listed intellectual property in the form of twelve pending patents all of which it scheduled

with an unknown value. According to its Schedule D, Debtor had approximately $6 million in secured debt, including TMC's secured claim of $1,244,294.43. Debtor listed its License Agreement with TMC in its Schedule G.

Shortly after the bankruptcy filing, Trustee moved to borrow funds from Debtor's insider, Armacore Holdings, LLC ("Armacore"), for Debtor's daily operating expenses. One member of Armacore is also the chairman of Debtor's board of directors. Trustee ultimately received $300,000 of the $450,000 in loans authorized by the court.

Trustee did not seek to assume Debtor's License Agreement with TMC within 60 days of the petition date, so it was deemed rejected by operation of law on November 12, 2013. § 365(d)(1). The next day, TMC filed a notice of election under § 365(n) to preserve its license rights.

### 1. Trustee's first sale motion

Trustee first sought to sell essentially all of Debtor's assets including all intellectual property (the "Assets") free and clear of all liens and interests, including TMC's interest as licensee in the de-icing technology, to stalking horse bidder Armacore. Armacore's offer of cash and the subordination of its existing liens was valued at $5 million.

TMC opposed Trustee's first sale motion, contending that a sale free and clear of its license rights under § 363(f) was an impermissible impairment of its elected license rights under § 365(n). Trustee had also failed to demonstrate adequate protection of those rights under § 363(e). The bankruptcy court agreed with TMC and denied Trustee's first sale motion.

-4-

## 2.    Trustee's second sale motion

Trustee again attempted to sell Debtor's Assets to Armacore, this time subject to all existing liens, interests and encumbrances, including the license rights of TMC ("Second Sale Motion").  Trustee valued the cash benefit of Armacore's offer at $630,000, which included a $250,000 up-front cash payment.

TMC also opposed the Second Sale Motion.  Among other things, TMC argued that its first priority security interest would attach to the sale proceeds and, therefore, none of the $250,000 cash received by Trustee would be available to pay creditors.  Thus, the sale would benefit only TMC.  TMC contended that Trustee failed to cite any authority that TMC's lien would not attach to the $250,000 cash payment and it would be too late to do so in his reply brief.  TMC also argued that Trustee, as with the prior sale motion, failed to show adequate protection for the proceeds from the sale of TMC's collateral; TMC was owed just over $1.8 million.[4]

In reply, Trustee argued that TMC was not entitled to the proceeds for two reasons.  First, TMC's claim was disputed by Debtor and other secured lienholders and the pending state court litigation between them involved the validity and priority of TMC's claim.  Second, Ninth Circuit law dictated that where debtor's assets are sold subject to a creditor's secured interest,

---

[4]  While the Second Sale Motion was pending, TMC filed two motions for relief from stay, one permitting it to foreclose on its collateral and the other allowing it to continue with the state court litigation involving Debtor.  Trustee opposed both motions, contending that the pending sale of Debtor's Assets and resultant termination of the automatic stay rendered them moot. The bankruptcy court granted both motions after ruling on the Second Sale Motion.

-5-

the creditor's lien remains intact and, therefore, the creditor is not entitled to a double recovery by also obtaining the sale proceeds. Stodd v. Reynard (In re Shooting Star Enters., Inc.), 76 B.R. 154, 156-57 (9th Cir. BAP 1987), aff'd, 843 F.2d 1576 (9th Cir. 1988). In other words, argued Trustee, the funds to be received by the estate were not "proceeds" of TMC's collateral, and thus its lien would not attach to them. As for adequate protection, Trustee argued that TMC had yet to explain what interest it held that was entitled to adequate protection. Trustee disputed the value of TMC's claim, contending it was limited to the initial $500,000 cash advance. Further, if TMC's expert estimated that losses from the rejection of its license ranged from $27-$38 million, and the license itself was worth $27-$30 million as TMC contended, then the underlying patents must have equal or greater value. If so, argued Trustee, then TMC was adequately protected.

In its sur-reply, TMC argued that Shooting Star did not control in this case. Specifically, TMC argued that the Shooting Star decision was supposedly, but not actually, premised on the notion that proceeds of a sale are not really "proceeds" at all under the Commercial Code or the applicable security documents, because (1) the sale is made subject to that security interest so the proceeds presumably must be for the "equity" in the assets and (2) allowing the creditor to retain its lien while at the same time having a lien on the sale proceeds would allow for an impermissible "double recovery." However, those presumptions, argued TMC, did not necessarily follow from all sales of assets subject to existing liens. TMC agreed that those conclusions made

-6-

sense in Shooting Star because the bankruptcy court had made actual findings that equity existed in the collateral. Here, however, Trustee had not (1) requested any finding of equity, (2) made any showing that the value of Debtor's Assets exceeded the $1.8 million owed to TMC or (3) ever contended that Debtor's Assets had equity in them beyond the amount owed to all secured creditors.

TMC argued that a buyer is not necessarily paying for the equity cushion when he buys an asset subject to existing liens, and a secured creditor will not necessarily receive a double recovery when that creditor retains the security in the sold collateral and receives the cash proceeds. Citing Stanziale v. Finova Capital Corp. (In re Tower Air, Inc.), 397 F.3d 191 (3d Cir. 2005), TMC argued that it is possible for a secured creditor's debt to exceed both the value of the remaining collateral and the purchase price for that collateral. Therefore, the secured creditor is not getting an impermissible "double recovery" when retaining its security interest in the collateral and receiving the cash proceeds.

**3.    The bankruptcy court's ruling on the Second Sale Motion**

Prior to the hearing on the Second Sale Motion, the bankruptcy court issued its tentative ruling in favor of Trustee, which it ultimately adopted as its final ruling. In the court's opinion, a sale of Debtor's Assets "subject to" under § 363(b)(1), as opposed to one "free and clear" under § 363(f), "substantially change[d] the equation" as to whether TMC's lien attached to the proceeds. In analyzing Shooting Star, the court held that the "subject to" condition means the buyer is purchasing a right,

-7-

title and interest _in_ collateral, but is not disturbing anything for compensation to which a secured creditor's lien might attach. This logic particularly applied in cases of intellectual property, where the very same quantum exists both before and after the sale.

Whether equity existed or not in Debtor's Assets was of no consequence to the bankruptcy court, even if required under Shooting Star. Relying on Shooting Star's holding that proceeds constitute whatever is substituted for the original collateral, the bankruptcy court reasoned that in this sale nothing was being "substituted" for the collateral, which would necessarily trigger the "proceeds" analysis. In the bankruptcy court's view, the sale at issue was more like a quitclaim than a purchase of equity. Trustee was selling the estate's right, title and interest, without warranty, to Armacore subject to existing interests in Debtor's Assets; he was not making any warranty of value or even one of quiet enjoyment. The court distinguished the cases cited by TMC, including Tower Air, as inapposite.

In summary, the bankruptcy court did not view the price being offered by Armacore for Debtor's Assets as "proceeds" of TMC's collateral at all because the collateral was not being disposed of or sold in any real sense. Because the sale was made "subject to," the price was only for Trustee's quitclaim to the encumbered assets, "an ephemeral interest not within the definition of proceeds found in CAL. COMM. CODE § 9102(a)(64)[5] or

_____

[5] CAL. COM. CODE § 9102(a)(64) provides the definition for "proceeds" under state law:

(64) "Proceeds," except as used in subdivision (b) of
(continued...)

-8-

otherwise." Id. at 4. Hence, no additional adequate protection was required because Trustee was not in any way changing or inhibiting the rights TMC might hold in its collateral.

After considering the parties' arguments at the hearing on the Second Sale Motion, the bankruptcy court ruled in favor of Trustee, but determined that the value of Armacore's offer would be $600,000. The opening bid started at $610,000. Parviz Acquisitions ("Parviz"), an affiliate of TMC, also appeared to bid. Ultimately, Parviz was the successful bidder at $910,000. In the order approving the Second Sale Motion, paragraph 11 states that the cash consideration received by the estate from the sale constituted unencumbered cash of the estate (the "Sale Order"). TMC timely appealed.

TMC then filed a motion in the bankruptcy court for a partial stay of the Sale Order pending appeal. In the bankruptcy court's order denying TMC's motion that the stay matter be heard on

---

[5](...continued)
Section 9609, means any of the following property:

(A) Whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral.

(B) Whatever is collected on, or distributed on account of, collateral.

(C) Rights arising out of collateral.

(D) To the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral.

(E) To the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

-9-

shortened time, the court noted that TMC misinterpreted the ruling on the Second Sale Motion. It was not solely based upon a perceived equity in the collateral. Rather, the court believed Shooting Star could be read more expansively than that. Nonetheless, given the disputed value of TMC's lien and the lack of any formal determination of value, the court believed the possibility of equity remained since the parties actively bid against each other to a level considerably higher than the opening bid. The bankruptcy court denied the stay. We granted TMC's motion for a partial stay of the Sale Order pending appeal.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(N). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUE

Did the bankruptcy court err in determining that the liens of secured creditors (including TMC's lien) did not attach to the $910,000 realized in the sale of Debtor's Assets and that those funds were unencumbered and available to pay unsecured creditors' claims and estate expenses?

## IV. STANDARDS OF REVIEW

"We review the bankruptcy court's conclusions of law and questions of statutory interpretation de novo, and factual findings for clear error." Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC), 391 B.R. 25, 30 (9th Cir. 2008)(citation omitted). We review orders to sell property under § 363(b) for an abuse of discretion. Id. (citing Darby v. Zimmerman (In re Popp), 323 B.R. 260, 265 (9th Cir. BAP 2005). A bankruptcy court abuses its discretion if it applies an incorrect legal standard or its

-10-

factual findings are illogical, implausible or without support from evidence in the record. TrafficSchool.com v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011).

## V. DISCUSSION

TMC does not appeal from the bankruptcy court's ruling that the auction sale could proceed or from the confirmed sale to Parviz. Instead, its appeal is limited to the bankruptcy court's ruling that TMC's lien did not attach to the funds received by the Trustee, allowing those funds to be used by the Trustee to pay Debtor's postpetition operating expenses, other administrative expenses and creditors' claims. We address TMC's arguments below.

## A.   A trustee's duties and sales under § 363

One of the primary duties of a chapter 7 trustee is "to collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest." § 704(a)(1). "To fulfill this duty, the trustee's 'primary job is to marshal and sell the assets, so that those assets can be distributed to the estate's creditors.'" In re KVN Corp., 514 B.R. 1, 5 (9th Cir. BAP 2014)(quoting U.S. Tr. v. Joseph (In re Joseph), 208 B.R. 55, 60 (9th Cir. BAP 1997)). "Indeed, underlying all of a chapter 7 trustee's actions, including decisions about sales of property of the estate, is the fiduciary duty to maximize distribution to creditors." In re Ellis, 2011 WL 61378, at *2 (Bankr. D. Idaho Jan. 7, 2011)(citing Dye v. Brown (In re AFI Holding, Inc.), 530 F.3d 832, 844-845 (9th Cir. 2008)).

To aid a trustee's goal of collecting cash to distribute to creditors, § 363(b) empowers a trustee to sell estate property

-11-

outside the ordinary course of business, subject to court approval, and after notice and a hearing. Property of the estate may be sold subject to liens, interests and encumbrances under § 363(b)(1).[6]

**B. The bankruptcy court did not err in determining that TMC's lien did not attach to the funds received in the sale.**

We first consider the threshold issue of whether Shooting Star requires a showing of equity in the assets being sold subject to existing liens, interests and encumbrances under § 363(b)(1) and TMC's contention that the bankruptcy court misapplied Shooting Star's holding. If a showing of equity is not required, then much of TMC's other arguments fail.

In Shooting Star, the debtor's major secured creditor, CCBL, had a perfected security interest in all of debtor's existing and after acquired property. 76 B.R. at 154. During the course of the chapter 7 case, the trustee sold inventory and collected accounts receivable, remitting the proceeds to CCBL and reducing its $400,000 debt. Id. Eventually, Reynard, a guarantor for debtor's obligation to CCBL, purchased CCBL's interest in the remaining assets, valued at $90,000, for $62,406. Id. at 154-55. Subsequently, over Reynard's objection, the bankruptcy court approved a sale of the trustee's "right, title and interest" in the remaining assets. Id. at 155. The purchaser, Hal-Optic, agreed to pay $5,000 for the assets and $17,000 for estimated unpaid chapter 7 operating expenses. Id. Ultimately, Hal-Optic

---

[6] Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]"

-12-

tendered a cashier's check for $5,000, plus $13,800 for the unpaid chapter 7 operating expenses. Id. Reynard then moved to compel the trustee to turnover all funds received as proceeds from the asset sale. The bankruptcy court ruled that the funds constituted "proceeds" under former CAL. COM. CODE § 9306. Id. Thus, because Reynard was the successor in interest to CCBL's interest in debtor's assets, including any proceeds thereof, Reynard was entitled to receive the proceeds. Id.

On appeal, the trustee argued that he sold only his "right, title and interest" in the collateral and not the collateral itself. Hence, the collateral was not "disposed of," and so no proceeds were obtained. Id. In Shooting Star, the court acknowledged that ordinarily monies received by the estate from the sale of an asset subject to a lien are proceeds. The result may be different, the court reasoned, if the trustee sells the estate's interest, subject to the secured creditor's lien rights. In that case, the monies received by the trustee are for the debtor's equity and not for the portion of the collateral necessary to pay the secured debt. In part, the court based its interpretation of the term "proceeds" upon the prohibition in the Official Comment 3 to U.C.C. § 9-306(1987) against double recoveries.[7] The court stated the secured creditor was sufficiently protected by its interest in the collateral. The

[7] In 1999, the California legislature adopted revisions to the Cal. Com. Code, to become effective on July 1, 2001. The "proceeds" provision contained in Cal. Com. Code §9306 prior to July 1, 2001, was revised and incorporated in Cal. Com. Code § 9102(a)(64). This revised provision moved the prohibition against double recoveries from the official comments to the statutory text by adding the phrase "to the extent of the value of collateral." See Tower Air, 397 F.3d at 198 n.8.

-13-

Ninth Circuit summarily affirmed, adopting the BAP decision in its entirety. 843 F.3d 1576.

Thus, Shooting Star stands for the proposition that funds received by the trustee in an asset sale subject to existing liens, interests and encumbrances are not subject to the security interests of the creditors whose liens against the collateral have been left fully intact. In other words, because the funds have not been substituted for the original collateral, they are not "proceeds" within the definition of the Commercial Code and therefore are not subject to attachment by the priority security interests.

TMC argues that Shooting Star requires a finding of equity. Unless the trustee shows equity exists in the assets being sold and the bankruptcy court makes that determination, argues TMC, then a secured creditor's lien attaches to what it believes are the "proceeds" received in the sale. TMC argues that Trustee failed to show that any equity existed in Debtor's Assets and the bankruptcy court erred by assuming that a mere offer by Armacore meant that equity did in fact exist. Trustee disagrees that Shooting Star requires a showing or finding of equity or, alternatively, contends the discussion of equity or apparent equity in the assets sold was not necessary to the court's decision. We agree with Trustee.

We conclude that Shooting Star does not require a showing by the trustee or a finding by the bankruptcy court of "equity" in a debtor's assets being sold subject to existing liens, interests and encumbrances in order for a trustee to be entitled to the sale funds. Changing the facts of Shooting Star slightly, presume that

-14-

the lien and assets were both valued at $90,000. Hence, no equity was available. Nonetheless, a purchaser sees value in the debtor's assets that no one else sees and offers the trustee $20,000 for the assets subject to the secured creditor's lien. Under Shooting Star, even despite the lack of equity, the creditor's lien would not attach to the sale funds because the funds were not substituted for the collateral, as would be the case in a sale free and clear of all liens under § 363(f), where both the lien and the collateral are gone. The assets being sold serve as collateral for the secured creditor's lien, and by selling the assets "subject to" that lien, the court has left the collateral fully intact. Thus, even without "equity" as we know it in the traditional sense, the result is the same. No substitution has occurred, the funds are not "proceeds" as defined by the Commercial Code, and the secured creditor's lien does not attach to them.

Changing the facts in Shooting Star again, presume that the lien was valued at $100,000 and the debtor's assets were valued at $90,000, leaving the creditor undersecured by $10,000 and no perceived equity. A purchaser, for whatever reason, offers to buy the assets subject to all liens, interests and encumbrances for $20,000. Under Shooting Star, even with the secured creditor's lien being underwater, the lien would still not attach to the sale funds because the funds were not substituted for the collateral. The creditor's lien, which has been left fully intact, is still valued at $100,000, particularly in the case of intellectual property, and the buyer will have to either satisfy it or risk the creditor foreclosing on its lien.

Therefore, contrary to TMC's arguments, Shooting Star does not turn on whether "equity" in the traditional sense exists in the debtor's assets. An equity cushion existed in that case, which raised the concern of a "double recovery." As the bankruptcy court here correctly noted, in a sale subject to, the "collateral is the same as it always was" and the "lien is stuck like glue on it." Hr'g Tr. (Jan. 7, 2014) 7:7-9. The price in such sales is only for the trustee's interest in the encumbered assets, "an ephemeral interest not within the definition of proceeds found in CAL. COM. CODE § 9102(a)(64) or otherwise."

We too find Tower Air distinguishable because the insurance policy at issue there was, by statutory definition, "proceeds." 397 F.3d at 196. We have no such "proceeds" in the instant case because the funds were not derived from the collateral; the money received by Trustee was in addition to the collateral.

We could locate only one case with facts somewhat similar to Shooting Star and that is In re Mannone, 512 B.R. 148 (Bankr. E.D.N.Y. 2014). There, the trustee sought to sell his right, title and interest in debtor's home "subject to" a secured creditor's existing mortgage lien. Debtor had valued the home at $405,268 and the mortgage lien was valued at $518,244.60 — i.e., no perceived equity. Nonetheless, a third-party purchaser offered to buy the home for $20,000. Trustee argued that the home had no equity (for purposes of debtor's homestead exemption), and that the estate would realize the entire $20,000. Id. at 150-51. Notably, the secured creditor never argued that it was entitled to the funds. Although the bankruptcy court did not approve the sale for reasons not relevant here, it found Trustee's lack of equity

-16-

argument flawed, and that the $20,000 sale price was in fact equity:

> Where an actual sale is to occur, the fair market value is the sale price, not a valuation given by the Debtor in the schedules or any other estimate or appraisal. The very sale proposed by the Trustee establishes that the Debtor's home is not worth less than the debt in that the Purchaser assumes all the debt. The additional $20,000.00 is therefore in addition to the debt, and can be considered equity.

Id. at 150.

Therefore, even if a secured creditor's lien is undersecured according to debtor's (or any other) valuation, the fact a third party is willing to pay something for the over-encumbered asset subject to the lien necessarily means that the asset has "equity" available for the estate (or, in Mannone, that equity is available for debtor's claimed homestead exemption). Thus, even if TMC's lien was undersecured, which was never conclusively established, the sale price of $910,000 could be considered "equity," even if Shooting Star did impose such a requirement. Accordingly, the bankruptcy court did not err in concluding that Armacore's offer to purchase Debtor's Assets subject to existing liens, interests and encumbrances may have evidenced the estate's equity in them.

TMC contends that its affiliate Parviz was not purchasing Debtor's Assets because of any perceived equity, but rather it had other motivations like protecting TMC's license interests. As we noted in First Yorkshire Holdings, Inc. v. Pacifica L 22, LLC (In re First Yorkshire Holdings, Inc.), "[t]he concept of 'equity' in property is based on the premise that the property itself has some economic value to its owner." 470 B.R. 864, 868-69 (9th Cir. BAP 2012)(citation omitted)(emphasis in original). We believe

-17-

TMC's argument to be a distinction without a difference.  As the bankruptcy court correctly noted at the hearing on TMC's stay relief motion:

> I'm just telling you that when somebody bids money, you think -- you can call it equity, you can call it defense, you can call it whatever you want, but they perceive a value that is at least equal, if not more than what they're putting down in cash, and that's the important point from our perspective, I think.

Hr'g Tr. (Feb. 25, 2014) 13:7-12.

We also disagree with TMC that the bankruptcy court erred in failing to order adequate protection of TMC's security interest in the funds received from the sale under § 363(e).  First, TMC has not cited any authority that adequate protection is required in a case where debtor's assets are being sold subject to existing liens, interests and encumbrances.  Further, "'[a]dequate protection' is intended to protect a creditor's interest from diminution in the value of its collateral when the Trustee uses or sells the creditor's collateral."  Salyer v. SK Foods, L.P. (In re SK Foods, L.P.), 2011 WL 2709648, at *1 (E.D. Cal. July 11, 2011) (citing § 363(b)(1); In re Hawaiian Telcom Commc'ns, Inc., 430 B.R. 564, 604 (Bankr. D. Haw. 2009)("An undersecured creditor is entitled to adequate protection payments to the extent that its collateral suffers from diminution in value.")).  TMC has not asserted or shown that the value of its collateral would decline if it were sold to Armacore or any other purchaser, thus requiring adequate protection.

Intellectual property, unlike other types of personal property, would appear to be adequately protected regardless of the buyer.  As the bankruptcy court correctly noted, intellectual

-18-

property is a body of knowledge that can be exploited in the marketplace; it is not like an automobile that will decline in value or like rents that can be collected and squandered. Hr'g Tr. (Jan. 7, 2014) 19:20-20:5. We have particular trouble seeing the merit of TMC's argument because the collateral was sold to its own affiliate, Parviz.

Accordingly, we conclude the bankruptcy court did not err in determining: that the liens of secured creditors, including TMC's lien, did not attach to the $910,000 received by Trustee in the sale of Debtor's Assets subject to existing liens, interests and encumbrances; and that those funds were available for Trustee to pay unsecured creditors' claims and estate expenses. The sale was merely a sale of Trustee's interest in the collateral and nothing more.

## VI. CONCLUSION

For the foregoing reasons, we AFFIRM.